Davis, Judge,
delivered the opinion of the court:
This Congressional reference[1] arises out of a plane crash in South America on February 25, 1960, which resulted in the deaths, while on an official tour, of nineteen members of the United States Navy Band. Plaintiffs represent the estates of these band members.[2] On behalf of each member, the suit seeks to recover $50,000', the amount of commercial insurance which allegedly would have been obtained but for the failure of Navy officials to supply insurance application forms prior to the flight. Pursuant to 28 U.S.O. §§ 1492 and 2509, the House of Representatives has referred H.R. 11905,86th Cong., 2d Sess. (1960), a bill for plaintiffs’ relief.
Since at least as early as 1952, it has been an established practice to provide Navy Band memlbers with commercial flight insurance forms prior to any band trip by air. This responsibility was assumed by the drum major, who was head of the operations department of the band. Although the forms were distributed primarily for the convenience of the individual members, their distribution was also for the benefit of the band as an entity — to prevent airport delays resulting from last-minute attempts to secure insurance. The members had come to rely on this practice.
The only time such insurance forms were not provided for an official trip was prior to the flight during which the *383 fatal accident occurred. The unusual circumstances surrounding the South American tour, of which this flight formed one leg, provide an explanation for the slip-up. Prior trips had been planned well in advance. This one, however, was first conceived on January 25, 1960, in connection with a February visit to South America arranged for President Eisenhower. A meeting was held on January 26 to apprise the bandsmen that a tour was tentatively being planned. On or about January 28, their commander informed them that the trip was definite, but was to be kept secret. Only a few details of the flight itinerary were made known. The bandsmen were not told of the flight on which the crash occurred, since it had not yet been scheduled.
Prior to their departure from Washington to Trinidad on February 6, 1960, many band members inquired about obtaining flight or life insurance for the South American tour. Ohief Petty Officer Zetty, the drum major, who regularly took care of the matter, made two different forms of commercial insurance available several days prior to that initial flight. One was a much costlier comprehensive policy covering accidental injury or death throughout the trip, for which at least two members (neither of whom died in the crash) applied. The other was typical one-way flight insurance, available only for flights with definite dates, and 68 of the 92 bandsmen chose that policy for the Trinidad flight.
Upon arrival by plane in Trinidad on February 6, the bandsmen boarded the U.S.S. Macon, which then departed for Bio de Janeiro and Buenos Aires, arriving at the latter port on February 20. On February 16, it was decided that a 19-man orchestral group of the band would fly back, on February 25, in a Navy plane from Buenos Aires to Bio de Janeiro, to provide music at a reception for President Eisenhower and the President of Brazil. Until the evening before the flight, some of the bandsmen were not aware that they would be on this side-trip. Several others, who did know of the trip, requested insurance forms from Chief Petty Officer Zetty, but none were handed out. It was on this February 25th flight that the bandsmen met their deaths in a mid-air *384 collision between tbe naval aircraft on which they were flying and a Brazilian plane of REAL Airlines. None of these men was covered by flight insurance on that trip.
Plaintiffs correctly acknowledge that their request for damages, based on the allegedly negligent failure of the Navy to provide insurance forms, presents no legal claim. Under the Federal Tort Claims Act, making the Federal Government responsible in tort, the United States is not liable for injuries sustained by servicemen, while on active duty, due to the negligence of others in the armed forces. Feres v. United States, 340 U.S. 135 (1950). In addition, the Act does not apply to any claim arising in a foreign country. 28 U.S.C. §2680(k) (1958); United States v. Spelar, 338 U.S. 217 (1949).
Since this is a Congressional reference, however, we are to examine the broader “equitable” facets of plaintiffs’ claim. We determine, in that connection, whether the nation owes a “debt” “based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law” (United States v. Realty Company, 163 U.S. 427, 440 (1896)). In making that evaluation it is proper to consider’, among other things, whether the claim is of a type recoverable against a private individual (Burkhardt v. United States, 113 Ct. Cl. 658, 667-68 (1949)). It is also relevant to take account of the general principles governing the particular area of the law bearing on the claim (Estate of Fairbank v. United States, 164 Ct. Cl. 1, 8, 10, 11 (1964).
We therefore take as our starting point the Federal Tort Claims Act, which makes the United States liable for “* * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant * * 28 U.S.C. § 1346(b) (1958). Since this statute embodies the general principles of tort law applicable between private parties, it can suitably provide the general framework for appraising the plaintiffs’ “equitable” claim. Because that claim is equitable, *385 not legal, we can put to one side the specific statutory limitations which bar plaintiffs from recovering under the Act; those exclusions have a special purpose unrelated to general tort principles.[3] Disregarding the exceptions, the issues are easily stated in the terms of the Act:
(1) Was the alleged “act or omission of * * * [the] employee of the Government * * * within the scope of his office or employment” ?
(2) If so, was that act or omission “negligent or wrongful”?
Defendant asserts that Chief Petty Officer Zetty undertook the distribution of flight insurance forms in a purely personal capacity, rather than as part of his Navy duties.[4] The Trial Commissioner seemed to voice a similar position at one point in his findings. Report of Commissioner, filed May 28, 1963, finding 16(a) (the drum major acted “on his own initiative and in a purely personal capacity outside of his prescribed duties”). We think, however, that the activities in question were well within the scope of the drum major’s employment, as that term of art has been judicially construed.
Under 28 U.S.C. § 2671 (1958), “ ‘Acting within the scope of his office or employment’, in the case of a member of the military or naval forces of the United States, means acting *386 in line of duty.” The courts have not attempted to draw any precise line between the two terms. See United States v. Hainline, 315 F. 2d 153 (C.A. 10), cert. denied, 375 U.S. 895 (1963); O'Connell v. United States, 110 F. Supp. 612, 614 (E.D. Wash., 1953). Both have been frequently applied in litigation involving soldiers travelling under orders in their personal automobiles from one post to another, as well as to comparable situations. E.g., Cooner v. United States, 276 F. 2d 220 (C.A. 4, 1960), summarizing prior case law in the area. For our purposes, we need point out only that the strictest view requires that the allegedly negligent serviceman 'be carrying out an authorized act rather than a detour or frolic, e.g., Witt v. United States, 319 F. 2d 704, 709 (C.A. 9, 1963), and also that the act foe part of his normal, regular, everyday duties over which his superiors may exercise control. Chapin v. United States, 258 F. 2d 465, 468-70 (C.A. 9, 1958), cert. denied, 359 U.S. 924 (1959); Cooner v. United States, supra, 276 F. 2d at 238-40 (dissenting opinion).[5]
Even under this stricter construction, Zetty’s conduct in the present case lay within the scope of his employment. Under that more limited view, the act must first foe part of the routine duties of the Government employee.[6] Zetty, who assumed responsibility for the distribution of insurance forms prior to each flight, received no personal gain. As head of the operations department of the band, his duties included assuring that personnel was assigned for each engagement, that the required gear or instruments were provided, and that all details necessary for a successful engagement were talcen care of. Finding 18 (a) (emphasis added). *387 Furtb.eim.ore, .though Zetty was then unaware of the provision, Article C-11112 of the Bureau of Naval Personnel Manual authorizes the commanding officer of any unit having cognizance over Department of Defense aircraft departures to make flight insurance available to the passengers.[7] The distribution of insurance forms was thus hardly a detour or frolic; rather, it was authorized conduct that constituted a part of Chief Zetty’s normal, everyday duties — another administrative detail of the band’s activities, to which he, as head of the operations department, attended.
The requirement that the negligent conduct of the Government employee be within the control of his superiors is likewise met. In one common type of case, a serviceman is ordered to travel to a different base by any means of transportation he chooses, and the Government may be thought to have no control over his activities in the intervening period. E.g., Cooner v. United States, supra; Chapin v. United States, supra. Here, the sanctioned activity, that of distributing insurance forms, was considerably more restricted ; it did not leave the drum major with a large measure of discretion over an extended period of time. Nor was he beyond the surveillance of his superiors. The evidence indicates that insurance forms were made available to and used by superior officers, and that they knew of the drum major’s practice. Finding 18(b). Unlike the conduct of a serviceman travelling by personal automobile from one base to another, Zetty’s activities could have been altered at any time by his superiors in precisely the same way they could control his other day-to-day work.[8]
*388 Having found Chief Zetty’s course-of-conduct with, respect to insurance forms to be within the scope of Ms employment, we must ascertain whether the omission in this instance constituted negligence. This case presents another application of the principle that a gratuitous duty, once assumed and relied upon, must be carried out with due care. See Prosser, The Law of Torts 186, esp. n. 80 (2d ed. 1955) (cases involving voluntary assumption of duty to obtain insurance) ; Harper and James, The Law of Torts (1956), vol. 1, §§ 7.6-7.7, vol. 2, § 18.6, p. 1045; Seavey, Reliance Upon Gratuitous Promises or Other Conduct, 64 Harv. L. Rev. 913, 928 (1951); Indian Towing Co. v. United States, 350 U.S. 61, 69 (1955) (quoted in n. 3, supra); United States v. Lawter, 219 F. 2d 559, 562 (C.A. 5, 1955). Zetty need not have undertaken the acquisition and distribution of flight insurance forms. But for at least eight years prior to the fatal accident he and Ms predecessors had always distributed the forms, this being one of the duties he assumed as head of the band’s operations department. The band members came to rely on this procedure. Particularly was their reliance strong during the tour of a non-English-speaking continent, where the members could not readily obtain the appropriate forms themselves. Their general interest in flight insurance for the air laps of this tour, was evidenced before the trip began; in response, the administration of the band supplied the necessary forms for the initial flight to the Caribbean (see findings 28(d), 29, and 30) and obtained additional fomis to be used for the return flight from South America scheduled for a major part of the band sometime between March 6 and March 10, 1960 (see finding 41). Similarly, there is no adequate reason to doubt the bandsmen’s concern with insurance for the fatal flight, which was not scheduled in advance of the tour but was first arranged toward the middle of February. When the flight became known, some bandsmen specifically requested that insurance applications be supplied (finding 38); others did not know that they would join the 19-man group until the previous evening (finding 35) and therefore had little time to ask for the forms. But the almost umversal interest in *389 flight insurance, while the band was in South America, is shown, we think, by the Puerto Belgrano incident mentioned later in this opinion (see finding 40).
The bandsmen’s reliance on the customary practice worked to their detriment. If they had been warned prior to their departure from this country that the established procedure was abrogated, they could have taken steps to help themselves, either individually or as an unofficial group. Since the fatal flight was not then scheduled, they could not have bought flight insurance for that trip, but they could have purchased comprehensive insurance or sought trip-insurance forms for possible use in South America. If they had been timely warned after the tour had begun, they still might have been able, by scurrying around, to obtain coverage through local branches of American firms or foreign insurance companies. Or they might have obtained from Chief Zetty the American forms he had in his briefcase. But as a result of their justified dependence on the established practice, none of the 19 men on the flight took out, or could take out, the flight insurance which they would probably have obtained if they had had adequate warning that they would be on their own.
In these circumstances negligence is clear. Chief Zetty omitted the customary procedure, and there is no reasonable exculpation for this lapse. That the drum major possessed the necessary forms prior to the fatal accident, but failed to distribute them, compounds the negligence; because he had planned to use these forms for the pre-scheduled return flight to the United States, their presence slipped his mind. Finding 41.
In sum, we have all the elements of a recognized tort: (a) a course of conduct undertaken by a band representative acting within the scope of his employment, (b) reasonable reliance by the bandsmen on this practice, (c) a negligent omission by the Navy representative to fulfill the responsibility he had shoiddered, and (d) injury to the dead band members and their families because of this negligent omission. Under the principles applicable between private persons — and generally incorporated into the Federal Tort *390 Claims Act — plaintiffs are equitably entitled to be paid the amount of the flight insurance their decedents would probably have purchased but for the Navy’s negligence.[9]
It is no answer that other, servicemen, perhaps in combat areas, are not similarly compensated as a result of air accidents. Eecovery here would not be reparation for the accident itself, nor would it be a gratuity to this limited group because it had to fly. Eecovery would be allowed simply because of the wrongful deprivation of the bandsmen’s opportunity to protect themselves by commercial flight insurance. Other servicemen have presumably not been led, by a long course of conduct, to rely on the Defense Department for help in obtaining commercial flight insurance. The members of the Navy Band were so led, and this reliance resulted in a loss peculiar to them. For similar reasons recovery should not be barred by the general provisions Congress makes for the families and heirs of deceased servicemen (see findings 47-49). Those benefits do not cover the extra financial loss incurred because these bandsmen, properly counting on the usual procedure, failed to obtain commercial flight insurance which would have been additional to the monies otherwise coming to their survivors. Because of this rightful reliance on the Navy, the men’s families now have less in assets than they would have had if the band’s administrators had acted with due care.
In assessing damages, plaintiffs assert that each estate or representative is entitled to recover $50,000, as the alleged amount of insurance that the deceased bandsmen customarily purchased; the Government contends that, if recovery is to be had, it should be limited to $20,000. We think that plaintiffs’ figure is not adequately supported by the record. Apparently no list was kept of past insurance purchases by the bandsmen. The Trial Commissioner has found, however, that only 68 of the 92 band members purchased one-way flight insurance from Washington to Trinidad, and that the *391 majority of those acquiring insurance obtained coverage of either $25,000 or the maximum $50,000. Five of the deceased band members purchased no insurance for this flight. To award $50,000 would he to select the maximum although there is inadequate proof that the band as a whole, or the particular bandsmen involved, would have purchased the maximum.
We think that each plaintiff is entitled to recover $25,000. Although immediately after the fatal flight the surviving bandsmen purchased $20,000 rather than $25,000 policies, this choice was apparently influenced, at least in part, by Rear Admiral Stephan, who wired to Washington for the insurance. Finding 43. Moreover, the insfurance forms which Chief Petty Officer Zetty had with him at the time of the fatal flight provided coverage up to $50,000, at $1 per $%5f)00. Findings 29(d) and 41. The same type of form was used by fourteen of the nineteen deceased bandsmen in insuring themselves for the flight to Trinidad, and, as 'we have noted, the evidence indicates that a majority of the 68 band members who purchased these policies obtained either $25,000 or $50,000 coverage. Finding 30(a). Since we have no means of discriminating among the plaintiffs’ decedents, and we reject the maximum for all, it is fair to choose the next lower level, $25,000, as the proper award.
As for the five bandsmen who did not acquire insurance on the flight to Trinidad, we find sufficient reasons for allowing their beneficiaries to recover in this equitable proceeding. See finding 30. Bergey seems to have mistakenly assumed that he was covered by the double indemnity provision of a policy carried by his parents. D’Amico had taken out a $25,000 MATS flight policy, which was invalid on a Department of Defense aircraft flight. The widows of Tramontana and Wilklow joined with the widows of eleven other band members in signing a letter to the House Committee on Armed Services, stating that their husbands had always purchased flight insurance policies in the past (“usually $20,000, sometimes more”), and that they would have done so prior to- the fatal flight had they been able. Above all, an event which occurred one day prior to the fatal 'accident *392 persuades us that all the ¡baud members would probably have obtained insurance for the latter flight. On February 24, the band was to fly on 'an Argentine aircraft from Buenos Aires to Puerto Belgrano. “[Mjost of the members of the band formed an opinion, based upon visual examination of the 'aircraft, that the aircraft was not safe, and they voiced their concern about the danger involved.” Finding 40. The trip was finally canceled for the officially stated reason that weather conditions would not permit a return in time for the February 25th flight- Whatever reluctance to purchase insurance the five band members may have previously had was surely dispelled by this unnerving experience. Consequently, we are not precluded from finding that relief should be afforded to these five bandsmen, under our broad equitable jurisdiction, as well as to the others.
For these reasons, we think that the estate or representative of each of the 18 deceased bandsmen, on behalf of whom this suit is brought, is entitled to equitable relief in the amount of $25,000.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Representatives pursuant to House Resolution 585, 86th Congress, 2d Session.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, and the briefs and argument of counsel, makes findings of fact as follows:
1. On April 25, 1960, there was introduced in the House of Representatives and referred to the Committee on the Judiciary, a Bill, House Resolution 11905, which is quoted below:
a Bi in
For the relief of the estates of certain former members of the United States Navy Band.
Be it enacted, by the Senate and House of Bepresenta-iives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $50,000 to *393 each of the estates of the following named former members of the United States Navy Band—
Lieutenant J. H. Fultz, W. F. Albrecht, E. L. Armi-ger, Henry Bein, M. G. Bergey, E. L. Clark, A. M. D’Amico, A. J. Desiderio, Junior, ft. S. Gaglio, Junior, E. D. Harl, G. E. Meier, E. H. Micallef, J. A. Mohs, W. M. Penland, E. W. Eichey, J. Eosenthal, V. P. Tra-montana, E. B. Wilklow, and J. B. Young, each such sum to be paid as a gratuity in connection with the death of each such former member in the plane crash which occurred during a flight from Buenos Aires, Argentina, to Eio de Janeiro, Brazil, on February 25, 1960.
The Committee on the Judiciary reported favorably on this Bill, without amendment, in a report dated June 30, 1960. House Eesolution 585, 86th Congress, Second Session, which was adopted on August 23,1960, provides:
Resolved!, That the bill (H.E. 11905) entitled “A bill for the relief of the estates of certain former members of the United States Navy Band”, together with all accompanying papers, is hereby referred to the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same and report to the House, at the earliest practicable date, such findings of fact, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as shall be sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the Claimant.
2. (a) Pursuant to the aforementioned House Eesolution 585, 18 petitioners, representing the estates of 18 of the 19 former members of the United States Navy Band (hereinafter sometimes referred to as the “Band”) who were killed in the mid-air collision which occurred between a United States Navy Aircraft (E6D) in which they were traveling and a Brazilian aircraft of EEAL Airlines over the Bay of Eio de Janeiro, Brazil, on February 25, 1960, filed petitions in the Court of Claims.
*394 (b) The names of the nineteen members of the Band who died in the collision are listed below:
Lieutenant J. H. Fultz
William Frederick Albrecht
Elmer Leroy
Henry (n) Bein
Milton George Bergey
Robert Lisle Clark
Anthony Matthew D’Amico
Albert John Jr.
Reyes Soto Gaglio, Jr.
Richard David Harl
Gerald Richard Meier
Raymond Hector Micallef
James Alan Mohs
Walter Michel Penland
Earl Weston Richey
Jerome (n) Rosenthal
Vincent Peter Tramontana
Roger Bruce Wilklow
Jefferson Bruce Young
(c) The only estate unrepresented in this proceeding before the Court of Claims is that of Lieutenant Fultz.
(d) All of the above-listed deceased members of the Band were traveling in a United States Navy aircraft under competent duty orders at the time of the fatal collision involved in this proceeding.
3. The United States Navy Band, as such, has been in existence since 1918. Between the years 1921 and 1923, segments of the Band accompanied important Government officials to Puerto Rico, Panama, Jamaica and the Virgin Islands. By the Act of March 4, 1925 (P.L. 611), ch. 536, § 17, 43 Stat. 1275; 34 U.S.C. § 596 (1952 ed.), the Congress officially recognized and designated the band then stationed at the Navy Yard in Washington, D.C., and known as the Navy Yard Band, as the “United States Navy Band”. The South American tour involved in this proceeding was the first extensive tour abroad that had been scheduled for the Band since it was officially recognized and designated the United States Navy Band.
4. The broad mission of the United States Navy Band is to represent the Department of the Navy in a musical ca *395 pacity. The functions of the Band at all times material herein were to:
(a) Participate in official occasions attended by the superior officers of the Government and/or the Department of the Navy in their official capacities and in performance of their official duties.
(b) Participate in military funerals of personnel interred at Arlington National Cemetery.
(c) Participate in parades and ceremonies incident to patriotic occasions, or gatherings of personnel of the Armed Forces, veterans or patriotic organizations.
(d) Present concerts on annual concert tours in the United States as approved by the President and directed by the Chief of Naval Personnel.
(e) Provide music for the production of motion pictures, films and recordings produced by the Navy.
(f) Provide music for broadcasts and telecasts produced by the Navy.
(g) Provide music for free social and entertainment activities conducted exclusively for military personnel and their invited guests.
(h) Participate in special events and present musical programs in support of Navy recruiting activities.
(i) Present concerts in the Capitol grounds, capital buildings, and public parks of the City of Washington, D.C.
(j) Participate in public events outside the Washington, D.C., area of a national or international character as approved by the Secretary of Defense and directed by the Chief of Naval Personnel.
5. Management control of the United States Navy Band, insofar as it applies to the employment of and detailing of the Band for participation in ceremonies and functions in the Washington, D.C., area, has been delegated by the Chief of Naval Personnel to the Commandant, Potomac River Command. Enlisted men of the Band are under the military and administrative control of the Commanding Officer, U.S. Naval Station, Washington, D.C. The Chief of Naval Personnel is responsible for the management and administrative control of the Band while it is on concert tours and participating in events outside the Washington, D.C., area.
6. Each deceased member of the Band listed in Finding No. 2(b), supra, except Lieutenant Fultz, was at the time *396 of the fatal collision a Regular Navy enlisted man serving on active duty in tbe Regular Navy under a Regular Navy enlistment of from four to six years, with, a rating of Musician. In each case the current duly executed enlistment contract at the time material herein provided, in pertinent part, as follows:
For and in consideration of the pay or wages due to the ratings which may from time to time be assigned me during the continuance of my service, I agree to and with-(Name of Enlisting Officer) of the United States Navy as follows:
First: To enter the service of the Navy of the United States and to report to such station or vessel of the Navy as I may be ordered to join, and to the utmost of my power and ability discharge my several services or duties and be in everything conformable and obedient to the several requirements and lawful commands of the officers who may be placed over me.
* * >fc s}* j$<
Sixth: I have had this contract fully explained to me, I understand it, and certify that no promise of any kind has been made to me concerning assignment to duty or promotion during my enlistment.
*****
7. The status of members of the United States Navy Band is the same as other Navy enlisted personnel in the sense that they are subject to military orders and regulations of general application in the Naval branch of the Armed Services, just like any other Navy personnel. The Band is different from the ordinary military unit in a number of characteristics, and the members thereof receive special consideration and preferential treatment, as indicated by the following facts:
(a) All of the members of the Band were and are professional musicians of high caliber. Approximately 80 to 85 percent of the members are college graduates, or were educated and trained in highly reputable conservatories or music schools, or by highly competent private instructors.
(b) The Band is permanently stationed in Washington, D.C. It is a professional, cohesive unit and members normally are not rotated. Many of the members complete their entire Navy service as a member of the Band.
*397 (c) Men are recruited for the Band directly from civilian life, and certain of the members entered into duty with the Band without undergoing any basic training.
(d) Members perform no military duties per se, but only professional musical duties and related administrative tasks, and they perform few work details. In those infrequent instances where such details are assigned to certain members, it is established policy to keep such assignments within a rigid safety framework, e.y., no string player or other musician whose abilities depend on the use of his hands is assigned to any detail in which his hands would be subject to possible injury.
(e) The work hours of the members are flexible, professional musician-type hours, based on engagements and rehearsals. As a consequence of the aforesaid flexible hours, many members engage in additional part-time occupations, e.y., private teaching, real estate.
(f) All members of the Band, no matter what their grade, wear the uniform of a Chief Petty Officer. Members may receive a second-class rating after a period of observation with the Band, irrespective of time in service or time in pay grade.
(g) Up until February 22,1961, all members of the Band received full subsistence and quarters allowance; but at the present time they receive expense funds while on their annual tours, in addition to what had been, prior to the above-mentioned date, full subsistence and quarters allowances.
(h) The United States Navy Band has been billed as “The World’s Finest”. While the evidence will not support a conclusionary finding that the Band is in fact the “finest” in the world, there is no doubt that the Band is recognized in musical circles as being outstanding.
8. Despite the foregoing facts (set out in Findings 7(a) to 7 (h) inclusive, supra) it cannot be said that the Band is the only unique unit in the United States Navy or other branches of the Armed Services. It is a matter of common knowledge that there are certain choral and other singing groups, as well as various musical units, e.g., the United States Marine Band, the United States Army Band and the United States Air Force Band, within the Armed Services *398 of the United States, that provide entertainment at official and public functions, which have some, if not all, of the stated characteristics of the United States Navy Band. While there may be differences in detail and degree with respect to the qualifications, training, selection and recruitment of, special privileges granted to, and preferential treatment received by, the personnel of such entertainment units, it cannot be questioned that all of them have certain features in common. Without question these musical and entertainment groups are different from the more conventional type military units. However, aside from units that provide entertainment, there are many special units within the various branches of the military forces which also have distinctive features and recruit personnel who possess unique talents and specialized skills, qualifications, education, background and training, and the members of such units receive special and preferential treatment with respect to assignments, hours of work, pay and ratings, among other things.
9. Between April 17,1950, and March 22,1960, the United States Navy Band was engaged outside the Washington, D.C., area in 20 concert tours which involved five trips (1950, 1951, 1952, 1953, 1957) from Washington, D.C., and return thereto from various places within the United States, by Government air transportation. Between June 15,1950, and November 10,1959, the Band or units thereof participated in 45 other events outside of the Washington, D.C., area. In 29 instances air transportation was involved. Two of the events, the South American tour which began on February 6, 1960, and an engagement in Toronto, Canada, in 1955, were outside the United States. The transportation for the Canadian trip was by commercial British planes.
10. The Bureau of Naval Personnel Manual includes the following provision:
0-11112-AVIATION TRIP INSURANCE
(1) The commanding officer of any unit having cognizance over the departure of Department of Defense aircraft carrying passengers is authorized to make aviation trip insurance available for passengers. The filing of applications and payment of premiums are to be accomplished through mail by individuals interested in *399 purchasing this insurance and mail boxes should be made available and cleared at least twice daily. No naval personnel are to be utilized in collecting premiums or selling this insurance. [Emphasis supplied.]
(2) Aviation trip insurance is generally purchased by an individual to insure himself for one trip, from one geographical location to another, or for a specified period of time. A policy insures any person traveling as a passenger on any Department of Defense aircraft provided said aircraft is at the time being utilized for the transportation of passengers, including cargo, and not in connection with flights for any other operational, tactical, or test purposes. The policies are normally issued in amounts of $10,000 or $20,000; in various time limits ranging from three days to one year with premium costs ranging from $1 to $50. One policy is issued for flights within the United States and another for world-wide flights. Extensions in time limits may be granted where authorized layovers occur.
11. Section 0701 of “United States Navy Regulations” provides:
0701. Responsibility of the Commanding Officer.
1. The responsibility of the Commanding Officer for his command is absolute, except when, and to the extent, relieved therefrom by competent authority, or as provided otherwise in these regulations. The authority of the commanding officer is commensurate with his responsibility, subject to the limitations prescribed by law and these regulations. While he may, at his discretion, and when not contrary to law or regulations, delegate authority to his subordinates for the execution of details, such delegation of authority shall in no way relieve the commanding officer of his continued responsibility for the safety, well-being, and efficiency of his entire command.
2. A commanding officer who departs from his orders or instructions, or takes official action which is not in accordance with such orders or instructions, does so upon his own responsibility and shall report immediately the circumstances to the officer from whom t'he prior orders or instructions were received.
12. Section 0709 of “United States Navy Regulations” provides:
0709. Welfare of Personnel.
*400 The Commanding Officer shall:
1. Use all proper means to promote the morale, and to preserve the moral and spiritual well-being of the personnel under his command.
2. Endeavor to maintain a satisfactory state of health and physical fitness in the personnel under his command.
3. Afford an opportunity, with reasonable restrictions as to time and place, for the personnel under his command to make requests, reports, or statements to him, and Shall .insure that they understand the procedures for making such requests, reports, or statements.
4. Insure that noteworthy performances of duty of personnel under his command receive timely and appropriate recognition and that suitable notations are entered in the official records of the individuals.
5. Insure that timely advancement in rating of enlisted personnel is effected in accordance with existing instructions.
13. Section 0114 of “United States Navy Regulations” provides, in pertinent part:
0114. Publishing and posting Orders and Regulations.
5. Such general orders, orders from higher authority and other matters which the commanding officer considers of interest to the personnel or profitable for them to know shall be published to the command as soon after receipt as practicable and shall be posted in whole or in part in a conspicuous and accessible place.
14. Section 0716 of “United States Navy Regulations” provides:
0716. Delivery of Orders to Personnel.
The commanding officer shall not withhold any orders or other communications received from higher authority for any person under his command, except for good and sufficient reasons, which he shall at once report to such higher authority.
15. Section 1201 of “United States Navy Regulations” provides:
1201. Regulatory Publications for the Department of the Navy.
1. The regulations, orders, and instructions issued for the guidance of all persons in the Department of the Navy are found in the following sources:
*401 (a) “United States Navy Regulations” issued by the Secretary of the Navy and approved by the President.
(b) “Manual for Courts-Martial, United States”, prescribed by the President, containing also regulations, definitions, and designations by the Secretaries of the military departments, and the “Naval Supplement to the Manual for Courts-Martial”, issued by the Secretary of the Navy.
(c) “General Orders” of the Secretary of the Navy, letters and issuances in the Navy Directives System addressed to the Department of the Navy and signed by the Secretary of the Navy, and general messages addressed to the Department of the Navy and originated by the Secretary of the Navy.
(d) “Court-Martial Reports, United States” issued by the Secretary of the Navy and the other Secretaries of military departments.
(e) “United States Navy Security Manual for Classified Matter” issued by the Chief of Naval Operations and approved by the Secretary of the Navy.
(f) Manuals and similar publications,’ including those within the Navy and Marine Corps Directives Systems, issued by the chiefs of bureaus and offices, the Judge Advocate General, and the Commandant of the Marine Corps, and approved by the Secretary of the Navy.
2. The regulations, orders, and instructions contained .in the said sources are binding on all persons in the Department of the Navy. No regulation, order, or instruction shall be issued by any chief of bureau or office, the Judge Advocate General, the Commandant of the Marine Corps, or other officer or official which conflicts with, alters, or amends any provision of the above-listed sources, except with the approval of the Secretary of the Navy. Subject to the foregoing, such officers may issue orders and instructions, including issuances in the Navy and Marine Corps Directives Systems, as to matters over which they exercise control.
16. (a) At some time prior to 1962, the drum major of the Band originated the practice of having some member of the Band obtain a supply of flight insurance forms at the air station or airport from which the Band was scheduled to-depart on a particular flight from Washington, D.C. These forms were usually obtained at least one or more days in advance of the flight and distributed to all of the members of *402 the Band who desired them before their departure. The forms ordinarily were made available to the members of the Band at the Sail Loft which is the permanent location of the Band in Washington, D.C., by the drum major who also had administrative duties as head of the operations department of the Band.
(b) On flights originating outside of Washington, D.C., the procedure followed was essentially the same as outlined above, with the exception of the place where the insurance forms were made available to interested members of the Band.
(c) The practice of distributing flight insurance forms to Band members was followed as a matter of normal routine with regard to all air flights made by the Band, with the exception of the flight which the Band made while on the tour in South America involved in this case.
(d) The procedure for distribution of flight insurance forms was adopted and followed as a matter of convenience to the Band members and in an effort to minimize confusion and delay that on occasion had resulted from their completing the forms at the air station or airport shortly before takeoff.
17. As a consequence of the practice and custom that was followed over an extended period of time of making flight insurance forms available to the members of the Band, they, or at least some of the members, came to rely on this practice. While many members of the Band regularly purchased flight insurance, not all of them did so on every flight. In one and possibly more instances, certain members of the Band did not purchase the regular trip flight insurance available, but rather obtained more comprehensive insurance coverage. In this connection, at least two members of the Band[10] obtained comprehensive insurance coverage which protected them for the entire period of time the Band was scheduled to be traveling on its South American trip. However, the forms for the comprehensive type of insurance were made •available to these and other members of the Band by the drum major.
*403 18. (a) Neither the Band member who happened to obtain the flight insurance forms for distribution before a particular scheduled flight, nor the drum major or his designee who made the forms available to members of the Band desiring them, took these actions in accordance with any specifically prescribed duty.
(b) Although distribution of the forms was authorized by Article C-1112 of the Navy Manual, Finding 10 swpra, the drum major was not aware of the provision when he carried out this activity. His duties did, however, include assuring that personnel was assigned for each engagement, that the required gear or instruments were provided, and that all details necessary for a successful engagement were taken care of. While there is no evidence of record that the drum major or any other member of the Band ever specifically advised superior officers in the Band of the practice that was followed by the drum major of making flight insurance forms available to the Band members prior to flight time, it is clear that such forms were made available to superior officers and that some of them used the forms, and there can be little doubt that they knew of this practice. At no time did any of these superior officers ever evidence any disapproval of the practice in question.
19. There was no regulation in effect at the time material herein, nor has there been at any time any regulation, which' would require any member of the Band or any other official of the Department of the Navy to make flight insurance forms available to members of the Band or any other officer or enlisted member of the Navy scheduled to travel by air; or which would prohibit them from doing so.[11]
20. On January 25, 1960, the Chief of Naval Operations, Admiral Arleigh Burke, requested the Chief of Naval Personnel and the Deputy Chief of Operations (Fleet Operations and Readiness) to investigate the feasibility of sending the Navy Band on a short trip to South America in the *404 U.S.S. Macon. At this time the Macon was in San Juan, 'Puerto Pico, and was scheduled to proceed to Buenos Aires, Argentina, via Trinidad, B.W.I., and Bio de Janeiro, Brazil, and to be in Buenos Aires in connection with, and support of, a trip to South America arranged for President Eisenhower.
21. The matter was investigated and it was determined that it would be feasible to send the Band to South America in the Macon provided that (a) departure was deferred until after a special concert scheduled for the Band on February 5, 1960; (b) the Band returned to Washington in time to start a concert tour scheduled to commence on March 15, 1960; and (c) the trip was Navy-sponsored and not tied in to the President’s trip to South America. The Chief of Naval Operations then decided to send the Band to South America in the Macon with the Band deriving logistic support from that ship. He directed that planning for such a trip proceed as soon as possible.
22. At a conference held on January 26,1960, it was determined that the Band, totaling 92 members, including an 18-man choral group (the Sea Chanters), could be flown from Washington, D.C., to Trinidad, B.W.I., in three Navy aircraft on February 6, 1960, where the Band would embark in the Macon which was already scheduled to be in Trinidad on that date. Chief Warrant Officer Mitchell, the third leader of the Band, was selected to proceed in advance of the main body in order to arrange the concert details and schedule. CWO Mitchell proceeded to South America on February 1, 1960.
23. Public announcement of the Band’s trip to South America was withheld at that time in order
(a) To afford the Potomac Biver Naval Command an opportunity to cancel or arrange substitute music for the local Navy Band engagements which conflicted with the South American trip.
(b) To notify the appropriate authorities in the South American countries to be visited and to propose a concert itinerary.
(c) To discuss the trip with appropriate Department of State and Department of Defense officials.
*405 24. At the conference held on January 26,1960, it was also determined that 50 members of the Band would have to be flown back to Washington, D.C., from South America sometime between March 6 and March 10, 1960, depending on schedules to be worked out later. A general schedule of concerts in Eio de Janeiro, Brazil, Buenos Aires, Argentina, and Montevideo, Uruguay, was discussed; but plans with respect to these concerts were contingent upon whether satisfactory arrangements therefor could be made. Commander Brendler, the leader of the Band, was told to inform the members of the Band of the trip as soon as possible in order that they could make personal plans. Commander Brendler was told to advise the members of the Band clearly that:
(a) The Band would be flown to Trinidad.on February 6. There it would join the Maoon and make the rest of the trip south in the Maoon.
(b) Fifty members of the Band would fly home to Washington, D.C., sometime between March 6 and March 10 and would later make the concert tour to commence March 15. The rest of the Band would return. to the United States in the Maoon.
(c) No Navy public announcement would be made-of the trip until the Potomac Fiver Naval Command took care of the prior conflicting engagements and until preliminary concert appearances in South America had been arranged.
(d) The trip to South America was not at the request of the White House and was not tied in with the President’s trip to South America. The trip was a Navy trip scheduled to take advantage of the fact that the Maoon was going to South America and could be used for quarters and logistic support of the Band during the Band’s trip. The Band was being made available to interested American Ambassadors and it was quite possible that the Band might play at occasions where the President was present, and that some short side trips might develop.
(e) Although it was natural for them to desire to tell their families of the trip, the members should refrain from discussing the trip publicly until the Potomac River Naval Command and South American arrangements could be completed.
(f) Band members would be notified of all further pertinent details as soon as they developed and became known.
*406 25. On January 26,1960, Admiral Burke, Chief of Naval Operations, notified the naval attaches in Brazil, Argentina and Uruguay that the Band (including the Sea Chanters) would go to South America in the Macon during that ship’s scheduled visit. He requested as many public appearances as feasible and directed the attaches to notify U.S. Ambassadors that in addition to public appearances, parts of the Band could be made available for official functions in connection with the President’s visit.
26. On January 26, 1960, the Chief of Naval Operations also informed the Naval Attache in Chile that another smaller 19-piece band would be embarked in the U.S.S. Moumt McKinley during that ship’s visit to Chile and, if desired, this unit could be made available to the U.S. Ambassador to Chile for public appearance and in connection with Presidential functions.
27. Although during the period encompassed by the tour of South America arranged for the Band the President of the United States also was engaged in a good will tour of South America, the Band tour was not officially scheduled in connection with, or in support of, the President’s visit to South America. However, it is clear that the Band was in fact utilized to complement the President’s trip.
28. (a) The members of the Band were first informed of the impending trip to South America on January 26, 1960, at which time they were advised that the tour was a possibility, but. not definite, and ordered not to tell anyone except their immediate families. On or about January 28, 1960, Commander Brendler called a meeting of the Band, definitely confirmed the trip, informed the members' in accordance with the instructions set forth in Finding 24, supra, and furnished them with other information available at that time.
(b) At the time of the meeting, the flight from Washington, D.C., to Trinidad, B.W.I., on February 6, 1960, and the return flight from South America to Washington, D.C., on some date between March 6 and 10, 1960, for fifty members who composed the so-called Spring Tour Band which was scheduled for a concert tour commencing on March 15, *407 . I960, were the only known or definitely scheduled air travel trips. The members of the Band were advised that in addition to the foregoing air flights, a helicopter flight might be made from Buenos Aires, Argentina, to Montevideo, Uruguay. No specific itinerary for the trip was announced at the meeting, as none existed, and it was clear to the members of the Band that plans were indefinite. On all tours that the Band had made prior to this one to South America, detailed itineraries were provided to the members of the Band about three weeks to a month prior to the commencement of the trip and printed itineraries were usually made available to them. No printed itineraries of the South American tour were furnished to the members of the Band until February 21, 1960, the day before scheduled engagements commenced.
(c) The members of the Band again were impressed at this second meeting with the importance of maintaining secrecy concerning the South American trip and ordered not to tell anyone about it except their immediate families.
(d) While the testimony on the question is conflicting, it is reasonably clear that there was some discussion at the meeting with respect to insurance forms being made available to the members of the Band for a possible helicopter flight from Buenos Aires to Montevideo, if this flight should materialize. However, the testimony presented in support of the contention that the members of the Band were definitely told that insurance forms would be made available to them for that particular flight and other flights that might originate while the Band was on tour in South America, was vague, uncertain, and general in nature. The strongest finding that can be made in this regard is that the members of the Band possibly were advised by Commander Brendler or Lieutenant Fultz, or someone else, to the effect that the question of making insurance forms available to the members of the Band for the above-mentioned possible helicopter flight would be met and looked into, if and when such a flight actually were scheduled.
(e) It was indicated to the members of the Band, and they realized, that there were elements of danger inherent *408 iii the tour to South America. They were advised that prior to the trip they should put their personal affairs in order, and the desirability of each of them making out his last will and testament was pointed out to them.
29. (a) Prior to the departure of the Band from Washington, D.C., to Trinidad, B.W.I., on February 6,1960, many of the members inquired, discussed and considered the possibility and need for obtaining additional flight or life insurance for the South American tour.
(b) Several days before the flight, Chief Petty Officer Arlington L. Zetty, the Drum Major of the Band and head of the operations department thereof, discussed with Chief Petty Officer Marcel A. Coviello the idea of having a certain member of the Band pick up a supply of air travel insurance application forms at the air station. However, another member of the Band who happened to be at the air station called Chief Coviello, who told him to obtain some forms and bring them in. Chief Coviello reviewed the form and decided that it was not suitable for the trip from the United States to a foreign country. Accordingly, he telephoned the Mutual of Omaha Insurance Company, explained the plans for the trip and obtained information concerning the types of insurance coverage available to the members of the Band. Thereafter, application forms for each type of policy that the members of the Band might select were obtained from Mutual of Omaha at the instance of Chief Coviello.
(c) Subsequently, Chief Zetty advised the members of the Band that there were two general types of policies available through Mutual of Omaha and application forms for both types were made available to members of the Band who desired them.
(d) One of these policies was a personal comprehensive type covering accidental injury or death resulting from any accident, including all modes of transportation. It provided coverage up to a maximum of $50,000 at a cost of $46 per person for a 31-day period, or $57.50 for a 45-day period. The cost of this type of policy for $10,000 coverage was $10.25 per person over a 31-day period, and $12.75 over a 45-day period. The other type of policy was the typical one-way *409 (Washington, D.C., to Trinidad) aerial flight personal insurance policy which provided coverage up to a maximum of $50,000 at a cost of $1 for each $25,000 of coverage, or a total of $2 for $50,000 of coverage. This one-way type of policy also was available for the 50 members of the Band who were to return from South America to Washington, D.C., by air sometime between March 6 and 10, 1960, but coverage for this trip could not be obtained until travel dates were definitely determined.
(e) In connection with the foregoing findings, it should be pointed out that the Government generally makes no provision for additional insurance to cover air travel for personnel in the Armed Services while traveling under duty orders. Information concerning the availability of additional personal risk insurance is furnished to personnel in the Armed Forces by designated military personnel as a matter of normal routine, upon request. In the case of the Navy Band, however, the information furnished to the members of the Band relative to the types of insurance policies available through Mutual of Omaha for the South American tour was. supplied to them in accordance with the established practice, followed with respect to the Band over an extended period of time.
30. (a) Some, but not all, of the members of the Band decided to obtain additional insurance coverage for the South American tour. Sixty-eight of the ninety-two members purchased the one-way aerial trip insurance policy from Mutual of Omaha covering the flight from Washington, D.C., to Trinidad, B.W.I., which was the only flight definitely scheduled for the entire Band.[12] It is a reasonable assumption that at least some of the members of the Band considered the possibility of obtaining additional insurance *410 that might be desirable and available after the travel plans, and dates, for the Band while on tonr were definitely finalized.
(b) Five members of the Band who were killed in the accident did not take out flight insurance for the trip from Washington, D.C., to Trinidad, B.W.I., namely :
Henry Bein
M. G.
A. M. D’Amico
V. P. Tramontana
R. B. Wilklow
(c) For several years the parents of Bergey, one of the five above-named members of the Band, had carried a regular commercial life insurance policy on their said son, with themselves as beneficiaries. It is not clear from the evidence, but a reasonable assumption may be made that Bergey was aware of the existence of this policy and that this may have been a factor in his not obtaining additional insurance protection for this trip. Bergey’s parents, if not Bergey him- • self, were under the impression that they were entitled to the benefit of a double indemnity provision in this policy. They were denied the benefit of the double indemnity payment provision because their son was traveling in a military plane under military orders at the time of his death in the crash involved in this proceeding.
(d) D’Amico, another one of the above-named persons who did not purchase the one-way trip flight insurance for the flight from Washington, D.C., to Trinidad, B.W.I., apparently had taken out a MATS flight policy in the amount of $25,000, which was invalid on a Department of Defense aircraft flight.
(e) The widows of two of the above-named individuals, Tramontana and Wilklow, who did not take out any of the flight insurance available for the trip from Washington, D.C., to Trinidad, B.W.I., joined with eleven other widows of members of the Band killed in the air crash involved herein, in signing a lengthy letter sent to the Committee on Armed Services of the House of Representatives, which letter reads, in part, as follows:
*411 Since tbe only known flights of any length were the one to Trinidad and the return flight from Rio de Ja-neiro, and in view of the relatively high cost and inadequate $10,000 blanket 45-day coverage, the ma-jority of the men purchased the $25,000 or $50,000 Trinidad trip insurance with the expectation that they would purchase insurance for the return trip from Rio de Janeiro at that time. So far as we know no one purchased the $10,000 blanket coverage.
* . ■ * * * *
Whatever the reason for the sudden decision to send the band to South America, the facts are that regularly scheduled tours are known and the itinerary prepared months ahead of time, and adequate flight insurance is regularly made available in advance at reasonable cost. In this case the absence of an advance itinerary due to the hasty arrangements were, as explained earlier, the direct cause of the unavailability of adequate insurance coverage and of the decisions by the men not to. take out the $10,000 high cost insurance that was available. We know without question that, but for these circumstances, our husbands would have protected their families with the maximum flight insurance available (usually $20,000, sometimes more) because this is what they have always done in the past. * * *
* * * # Ü:
(f) At least two members of the Band, Joseph Reines and Roy A. Wilcox, who were not killed in the air crash, purchased from Mutual of Omaha a $10,000 insurance policy each, which provided comprehensive coverage over a 45-day period and protected them for the éntire period the Band was scheduled to travel on its South American trip. In addition, Reines also obtained the one-way aerial flight per-' sonal insurance policy available for the trip from Washington, D.C., to Trinidad, B.W.I.
31. On February 6, 1960, the Band flew to Trinidad and went aboard the U.S.S. Macon for the trip to South America. Rear Admiral E. C. Stephan, United States Navy, Commander of the Navy’s South Atlantic Force, also embarked in the Macon as commander for the trip to South America.
32. On February 11, 1960, the Chief of Naval Operations decided that the Navy Band would be made available to the American Ambassador to Chile on February 28, 1960, *412 and that one Navy aircraft (R6D) would be dispatched to Buenos Aires, Argentina, for that purpose. The Commander, South Atlantic Force, at sea aboard the I7.S.S. Macon, and Commander Brendler, the Band leader, were notified accordingly.
33. At least some members of the Band were advised of a change in plans, including a trip from Buenos Aires, Argentina, to Santiago, Chile, as early as February 13, 1960. Other members of the Band were aware of a scheduled flight from Buenos Aires, Argentina, to Santiago,' Chile, as early as February 15,1960.
34. The TJ.S.S. Macon, with the Navy Band embarked, arrived at Rio de Janeiro, Brazil, on February 16, 1960. On that date the American Ambassador to Brazil inquired of Rear Admiral E. C. Stephan, Commander of the United States Navy’s South Atlantic Force, and Commander Brendler, whether an orchestra from the Band might return to Rio de Janeiro to provide music for a reception scheduled on February 25, 1960, for President Eisenhower and the President of Brazil. On the same date the Ambassador was advised in the affirmative and arrangements were made for a 19-man orchestral group from the Band to be flown from Buenos Aires to Rio de Janeiro on February 25, 1960, in the same Navy aircraft which had been dispatched to Buenos Aires for the flight scheduled for the Band from that place to Santiago, Chile, on February 28,1960.
35. The U.S.S. Macon left Rio de Janeiro on February 17, 1960, and arrived at Buenos Aires on February 20. As early as February 18, members of the Band learned of the flight that had been scheduled from Buenos Aires to Rio de Ja-neiro on February 25. Definite knowledge as to which of the Band members would compose the 19-man orchestral group and make the trip back to Rio de Janeiro was not imparted to certain members of the Band who made the trip until the evening before the flight departed.
36. On February 25, 1960, all of the 19 members of the Band comprising the orchestral group designated to perform during the reception scheduled on the same date at the American Embassy in Rio de Janeiro, Brazil, met their death when the Navy aircraft (R6D) in which they were *413 being transported from Buenos Aires, Argentina, to Rio de Janeiro, Brazil, and the Brazilian aircraft of REAL Airlines collided in mid-air.
37. None of the members of the Band who were killed in the Navy aircraft on February 25, 1960, was covered by flight insurance.
38. Sometime between February 20 and February 24,1960, some of the 19 members of the orchestral group of the Band scheduled to fly back to Rio de Janeiro from Buenos Aires on February 25, 1960, asked that flight insurance be obtained for them. CPO Zetty talked with several of the members of the Band and advised them that he would look into the matter. Chief Zetty then mentioned the matter to CPO Coviello, the Band’s administrative officer, who had been temporarily detached from the Band and attached to Rear Admiral Stephan’s staff as a Technical Assistant, and requested Chief Coviello to take up the matter with Lieutenant R. S. Brown, a member of Rear Admiral Stephan’s staff, who was acting as liaison officer with the Band during the. South American tour. Chief Coviello discussed the matter with Lieutenant Brown and asked him to look into the possibility of obtaining insurance coverage for the members of the Band who had been designated to make the flight back to Rio de Janeiro. Lieutenant Brown advised Chief Coviello that he was going back to the airport where the flight was to originate and that he would look into the matter. Lieutenant Brown never reported back to Chief Coviello and nothing was heard concerning the availability of insurance for the flight. Lieutenant Brown was a passenger on the Navy aircraft which crashed in the air collision on February 25,1960, involved herein.
39. Chief Warrant Officer Mitchell, who preceded the Band to South America on February 1, 1960 (as noted in Finding 22, supra), originally made arrangements with the U.S. Naval Attache in Buenos Aires for the Band to hold a concert at Puerto Belgrano, Argentine Naval Air Base on February 27, 1960. Air transportation was to be provided by the Argentine Navy, assisted by one aircraft under the control of the U.S. Air Attache in Buenos Aires. As a result *414 of a later decision for the Band to play at Santiago, Chile, on February 28, 1960, the Puerto Belgrano trip was rescheduled for February 24, 1960. As noted in Finding 40, post, this flight was finally canceled completely.
40. On February 18, 1960, members of the Band became aware of the proposed trip to Puerto Belgrano scheduled on February 24, 1960. On the evening of February 23, 1960, CPO Zetty was asked about the availability of flight insurance for the trip. Chief Zetty advised these bandsmen that he would look into the possibility of obtaining insurance, discuss the matter with CPO Coviello, and advise that same night what had been done about the matter. Upon being asked again later on that same evening, Chief Zetty advised that he had not heard and did not know whether any arrangements had been made with respect to flight insurance. On the morning of February 24,1960, the members of the Band proceeded to the airport in Buenos Aires from which point they were to fly to Puerto Belgrano. Upon arrival at the airport a number of the Band members made requests of Chief Zetty for flight insurance. It appears from the evidence that most of the members of the Band formed an opinion, based upon visual examination of the aircraft, that the aircraft was not safe, and they voiced their concern about the danger involved. The flight was finally canceled for the officially stated reason that weather conditions would prevent the return of certain members of the Band who also were designated to make the flight scheduled on the morning of February 25, from Buenos Aires to Bio de Janeiro. No information as to the availability of flight insurance for the proposed Puerto Belgrano flight was received prior to its cancellation. After the flight was canceled, the members of the Band returned to the U.S.S. Macon.
41. At the times that inquiries were made of CPO Zetty concerning the availability of flight insurance covering both the Puerto Belgrano flight that was finally canceled and the flight from Buenos Aires to Bio de Janeiro scheduled on February 25, Chief Zetty had in his brief case approximately 55 flight insurance forms which it had previously been understood would be made available to those members of the *415 Spring Tour Band scheduled to fly back from South America to Washington, D.C., between March 6 and March 10, 1960, who might desire such insurance. The brief case was at all times in Chief Zetty’s possession, in his compartmentj or some place where it could have easily been reached. CPO Coviello also was aware that Chief Zetty had these forms in his possession. There is serious doubt as to whether these particular flight insurance forms would have been the' proper ones for the Puerto Belgrano flight because travel on that trip was scheduled in an Argentine aircraft and the terms of policy obtainable with that type of form indicates that flights in Argentine aircraft, other than certain commercial aircraft, would not be covered. It appears that this same type of form could have been utilized by members of the orchestral group desiring flight insurance covering the fatal flight on February 25, 1960, from Buenos Aires to-Eio de Janeiro. The record does not disclose that anyone realized this type of application form could be used, or in-, quired about using the forms for either the canceled Puerto Belgrano flight or the fatal flight to Rio de Janeiro. Chief Zetty testified at the trial that he did not think of these forms; but on the basis of the entire record, including other' testimony by Chief Zetty, it is reasonable to conclude that his primary thought was to hold these application forms for the use of those members of the 50-man group scheduled to return from South America to Washington, D.C., by, air between March 6 and March 10,1960, who might desire such insurance for that flight.
42. Shortly after the fatal collision on February 25, i960, a meeting of the members of the Band was held at which time it was decided to attempt to obtain flight insurance coverage for the scheduled flight to Santiago, Chile, on February 28, 1960, and for any other flights that might be scheduled during the remainder of the South American tour.
43. On February 27, 1960, Rear Admiral Stephan sent a message to the Bureau of Naval Personnel in Washington, D.C., requesting that every effort be made to arrange for personal life insurance in the amount of $20,000 for each of the members of the Band to commence February 28, 1960, *416 aixd be effective for the remainder of the trip, ■until the Band returned to Washington, D.C. The Bureau of Naval Personnel arranged for $20,000 insurance coverage for the remaining 74 members of the Band, covering all air travel between February 28 and March 8,1960, at a cost of $10 per person, through the McLaughlin Agency of Washington, D.C. The insurance was underwritten by the North American Insurance Company. The insurance was obtained after about 5y2 hours following the time the request was originated. The $10 premium for this insurance was paid individually by each member of the Band after their return to the United States.
44. On March 16, 1960, pursuant to the direction of the Honorable Carl Vinson and under the authority vested in him as Chairman of the Committee on Armed Services, House of Bepresentatives, a special subcommittee was established “to inquire into the circumstances of the crash of a Navy airplane carrying members of the Navy Band at Bio de Janeiro on February 25,1960”.
45. The questions to which the special subcommittee (referred to in Finding 44, supra) sought answers are as follows:[13]
(a) Was the South American tour of the U.S. Navy Band related to the President’s visit to South America?
(b) What monetary benefits are being provided by the Government to the dependents of the victims of the plane crash?
(c) Is the present survivor benefit system provided for personnel of the armed services effective?
(d) Should individuals in the armed services, whose duties do not ordinarily qualify them for extra hazard duty pay be entitled to additional indemnification by the Government when required to travel by air?
(e) Were individual members of the U.S. Navy Band deprived of the opportunity to obtain flight insurance coverage prior to the flight to Bio de Janeiro because of a failure of representatives of the Navy to discharge their official responsibilities or was it due to an unfortunate set of unpredictable circumstances?
*417 46. The report (referred to in footnote 13) of the special .-subcommittee, reflects (p. 5817), among other things, that survivor benefits for members of the armed forces, effective January 1, 1957, were provided by Public Law 881, 84th Congress, as follows:
(a) Death gratuity amounting to 6 months basic pay (including special and incentive pay), with a minimum of $800 and a maximum of $3,000 payable to the survivors.
(b) Dependency and indemnity compensation amounting to $112 per month plus 12 percent of the deseased’s [sic] monthly basic pay. This is a monthly benefit payable to the wife of the deceased until she remarries or dies. In the case of dependent parents additional monthly benefits are also payable in amounts ranging from $10 to $100 per month depending on the income level of the parents (maximum income of two parents, $2,400 annually).
(c) Social security family benefits which are payable to family groups in accordance with existing social security regulations. This benefit is particularly well suited • to supplement the widow’s benefit provided through (b) above to provide the family, with children under 18, with substantial benefits.
Eree Government insurance of $10,000 was abolished by Public Law 881-84. The monetary benefits previously provided by that type of insurance were merged with the previously existing death compensation benefits payable by the Veterans Administration to provide the new benefit entitled “Dependency and Indemnity Compensation.”
47. The South American tour of the Band in no way affected the validity of any Government insurance that a member of the Band may have held; nor did it affect survivor’s and Veterans Administration benefits accruing to their dependents in case of accidental death.[14]
48. The table below reflects selected and typical actual examples of the monthly dependency and indemnity provided by the Veterans Administration benefits payable to widows of individuals who died in the plane crash at Rio de Janeiro together with the estimated present dollar value of benefits. The projected estimated values have been ap *418 propriately reduced to reflect available experience on remarriage and mortality factors:
Widow Age VA monthly benefit[1] Insurance equivalent [2]
A_. $154 $35,485-
B.. 147 33,516
C.. 153 33,269-
D_ 143 26,658
E.. 142
The monthly benefit provided by the Veterans Administration indicated in the preceding table represents only one element of the survivor benefit package. Other benefits include the death gratuity and the various social security benefits. These benefits are provided without reference to the fact that certain of the deceased were members of the Navy Band while others were crew members or simply passengers.[15]
49. .The number of deaths which occurred on active duty annually in each of the service departments for the years 1955 to 1959 are reflected in the following table:[16]

*419 50. As to indemnification protection for air travel, the subcommittee report[17] to the full committee stated, as follows:
Military service is inherently a hazardous occupation. Individuals who enter the armed services immediately acquire a so-called military status which distinguishes them from their civilian contemporaries and makes them completely and irrevocably subject to the uncertainties of military life. This uncertainty manifests itself in many ways but basically arises from the necessity that the individual be available to perform whatever task or duty may be assigned in support of an assigned military mission.
Because of this fact of military life many individuals in the armed services through no action of their own, are frequently exposed to situations which may be considered hazardous. On occasion these hazards result in death, and consequently our Government has historically acknowledged its responsibility to provide a measure of relief to the dependents of the deceased by enacting legislation which specifically provides for deaths which occur as a consequence of military service.
In summary, therefore, the system of survivor benefits developed for members of the armed services, and particularly the benefits payable by the Veterans’ Administration, is primarily justified because of the extra hazard of military life in general.
Therefore, it appears that any effort to develop a refinement of this general principle to distinguish, by degree, between the various individual hazards of military life in the establishment of survivor benefit protection or indemnification, would be manifestly impractical.
Thus, individuals in the military who, because of their duties, feel that additional indemnification is required necessarily are required to obtain this additional protection from commercial sources.
The subcommittee therefore considered, but rejected, the possibility of providing additional indemnification to individuals who travel by air under Government orders since the protection already provided embraces consideration of this aspect of military service.
51. With respect to commercial flight insurance, the subcommittee report[18] to the full committee stated as follows:
*420 COMMERCIAL FLIGHT INSURANCE
Department of Defense policy on the availability of flight insurance is reflected, in the case of the Navy, in paragraph C-11112 of the Bureau of Naval Personnel Manual.[19]
This official regulation attempts to explain the general purpose and nature of “aviation trip insurance” and also states that — [See footnote 19, m/m].
It is significant to note that the quoted regulation reflects the official position of the Department of Defense that—
(a) flight or trip insurance is a personal rather than an official matter;
(b) military personnel are not to be utilized in attempting to sell this type of insurance to personnel or to collect premiums on this insurance; and
(c) commanding officers of air installations are permitted^ but not required, to make flight or trip insurance available to passengers.
The subcommittee has given considerable thought to the subject of flight trip insurance for members of the armed services. The committee concurs with existing Department of Defense policy to the effect that flight insurance, like any other type of so-called extra hazard insurance, must necessarily be a purely personal matter.
52. With respect to the availability of flight insurance to members of the Band, the subcommittee, upon the basis of the information collected by it, reported[20] to the full committee, as follows:
(a) many members of the band, but not all, desired flight insurance to apply whenever they traveled by air;
(b) individuals in the Navy attempted to satisfy this personal desire of the Navy bandsmen in this instance by doing more than Avas required and, in fact, even authorized by Navy regulations;
*421 (c) there existed a lack of complete information on the actual availability and utilization of flight insurance;
(d) the Navy bandsmen unfortunately assumed that the itinerary and transportation planned for the band would remam unchanged; and finally,
(e) the Navy understandably altered its tour itinerary to satisfy changes in circumstances.
53. With respect to the cause of the collision, the subcommittee reported[21] to the full committee its' conclusion “that . the accident was not the result of any mechanical or human
failure on the part of any person or persons in the United States Naval service.” •
54. The conclusions and recommendations of the subcommittee reported to the full committee stated,[22] as follows:
The subcommittee has endeavored throughout its investigation to retain an objective attitude in assessing the significance of all the relevant facts brought to its attention.
The subcommittee recognizes the circumstances which suggest the understandable desire of the Navy bandsmen for the enactment of legislation which will in some measure attempt to indemnify the widows of the U.S. Navy Band for the tragic death of their husbands. Bills have been introduced in both the House and Senate to accomplish this purpose. These bills, H.B,. 11905, H.B. 11997, and S. 3382, have been referred to the respective Judiciary Committees of the House and Senate, since they were; in each instance, introduced in the form of private relief legislation.
The subcommittee has, as this report should indicate, exhaustively explored the desirability of providing relief to the survivors in the form of general legislation. It is the considered opinion of tire subcommittee that relief in the form of general legislation is not appropriate.
The Committee on Armed Services, however, refrains from providing any opinion on the merits of the legislation referred to the Judiciary Committee since the merits of such legislation remains within the province of that committee.

 Since tills case was referred, the pleadings filed, and the trial held prior to the Supreme Court’s decision in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we deem it proper to file this report without reference to the opinions in that case. Befendant’s belated assertion that the court is without jurisdiction to hear the case is rejected.

 The suit is brought on behalf of the estates of the eighteen enlisted men killed in the accident. The estate of Lieutenant J. H. Fultz, also fatally injured, is not represented.

 The Tort Claims Act contains various exceptions and exclusions but, aside from the two aspects already mentioned, we do not find that plaintiffs’ cause of action would be barred by any of these provisions. In particular, it seems plain that the conduct here involved is not a discretionary function under 28 U.S.C. 1 2680(a) (1958). In a case not unlike the present one, the Supreme Court stated, “The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to * * * [do so] and engendered reliance * * *, it was obligated to use due care * * * * If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the united States is liable under the Tort Claims Act.” Indian Towing Co. v. United States, 350 U.S. 61, 69 (1955). See also American Exchange Bank v. United States, 257 F. 2d 938, 940-41 (C.A. 7, 1958).

 To buttress its position, defendant emphasizes findings contained in the report of a special subcommittee (of the House Committee on Armed Services), which was convened to inquire into the circumstances of the fatal accident. See findings 44-54. Although the subcommittee did comment that flight insurance for servicemen was a personal matter, the statement was a broad one dealing with all members of the armed forces; it is not necessarily applicable to the special situation presented here. The subcommittee went on to conclude that relief to the survivors of the bandsmen should not be provided in the form of general legislation; it did not, however, take any position regarding the private bills for plaintiffs’ relief, one of which has been referred to this court by the House Judiciary Committee.

 The Tort Claims Act employs the law of the particular place where the act or omission occurred, but in this “equitable” proceeding against the united States arising out of a foreign accident it is appropriate to look to the principles of tort law accepted generally in this country.

 In the Chapin case, supra, the court stated that “the act of a soldier’s travel on a permanent change of station is not a part of the duties for which he is engaged.” 258 F. 2d at 469-70. In a prior part of the opinion, it had pointed out that “this situation is entirely unlike those in which the employee’s duties require continuous travel.” Id. at 468. (Footnote omitted.) From these statements, we may infer that the rule the court was applying requires, at most, that the actions involved be part of the regular duties of the serviceman in order to lie within the scope of his employment. See also the dissenting opinion in Cooner, supra, 276 F. 2d at 239, 240, to the same effect.

 Plaintiffs contend that this authorization to make flight insurance available was in fact mandatory, and the failure to comply was negligence per se. Assuming that this provision has the force of a regulation, we do not construe its apparently permissive terms as mandatory. Cf. Creek Nation v. United States, 318 U.S. 629, 639 (1943).

 When the Trial Commissioner found that Zetty undertook the acquisition and distribution of flight insurance forms “on his own initiative and in a purely personal capacity,” we think he probably meant that the drum major’s activities were “purely personal” in the sense that they were not specifically required by regulation or order. The evidence does not support any finding that these activities were for personal gain or were otherwise outside the scope of the drum major’s employment. It is clearly not true that only those actions of a serviceman which are required (not simply authorized) by regulation or order are within his scope of employment.

 Plaintiffs also contend that the Navy negligently failed to apprise the deceased band members of the South American itinerary and the means of transportation to be used on the tour. Though we need not reach this issue, it should be noted that, by the terms of their enlistment contracts, plaintiffs’ decedents were required to serve at any duty station and in any manner required. Findings 6 and 7.

 Joseph Reiners, Chief Musician, and Ray A. Wilcox (MUC), neither of whom was in the 19-man orchestral group involved in this case.

 See Finding 10, supra, and Finding 51, post, for references to a provision included in the Bureau of Naval Personnel Manual entitled “Aviation Trip Insurance”, which is the only documentary evidence of record that directly and specifically relates to the authority of naval personnel to make aviation trip insurance available for passengers traveling on Department of Defense aircraft.

 A majority of the members who purchased insurance obtained either the $25,000, or the maximum amount of $50,000, coverage for this leg of the tour. Finding 28(b), supra, reflects that the fifty members of the Band who composed the “Spring Tour Band” were scheduled to return by air from South America to Washington, D.C., on some date between March 6 and 10, 1960, and Finding 29(b) discloses that the one-way type of aerial insurance policy was not available to them until departure dates were definitely known. As noted in Finding 24, supra, the other members of the Band were scheduled to return to the united States in the U.S.S. Macon.

 See Report (Joint Ex. 1, p. 5816) submitted under date of May 17, 1960, to the Chairman, Committee on Armed Services, House of Representatives, by the special subcommittee.

 See Joint Exhibit 1, p. 5810 (referred to in footnote 13, supra).

 This monthly benefit is $112 per month plus 12 percent of the basic pay payable to the decedent.

 The marked difference in insurance equivalent values is primarily the result of the probability of remarriage by younger widows.

 The table* and explanatory factual comments set forth in this Finding are incorporated in the subcommittee report (Joint Exhibit 1, pp. 5818-5819, referred to in footnote 13, supra).

 See Joint Exhibit 1, p. 5820 (referred to in footnote 13, supra).

 See Joint Exhibit 1, pp. 5820-5821 (referred to in footnote 13, supra).

 See Joint Exhibit 1, p. 5821 (referred to in footnote 13, supra).

 Paragraph C-11112 (Secs. (1) and (2)) is quoted in Finding 10, supra; but for convenient reference in considering the statements of the subcommittee relating to tbat provision it is repeated below :
"The commanding officer of any unit having cognizance over the departure of Department of Defense aircraft carrying passengers is authorized to maice aviation trip insurance available for passengers. The filing of applications and payment of premiums are to be accomplished through mail by individuals interested in purchasing this insurance and mailboxes should be made available and cleared at least twice daily. No naval personnel are to be utilized in collecting premiums or selling this insurance.” (Emphasis supplied.)

 See Joint Exhibit 1, pp. 5823-5824 (referred to in footnote 13, supra).

 See Joint Exhibit 1, p. 5824 (referred to in footnote IS, supra).

 See Joint Exhibit 1, p. 5824 (referred to in footnote 13, supra).