Willi, Commissioner,
delivered the opinion of the Review Panel:
By H.R. Res. 1098 of the 90th Congress, the United States House of Representatives on May 27, 1968, referred H.R. 1624, a bill for the relief of Sherman Webb and others, to the Chief Commissioner of the United States Court of Claims pursuant to 28 U.S.C. § 1492 (1964 ed.) and 28 U.S.C. § 2509 (1965-8, Supp. IV). The Chief Commissioner referred the case to the late Commissioner Richard Arens for proceedings in accordance with the rules, and designated the above members of the Review Panel to consider the trial commissioner’s report on the merits of plaintiffs’ right to recover damages for certain crop losses caused by flooding of the St. Francis River below a dam built and operated by the U.S. Army Corps of Engineers.
On September 26, 1969, following a trial and briefing by the parties, Commissioner Arens issued his opinioii and supporting findings of fact. He concluded that although there was no legal liability, plaintiffs had a valid equitable claim against the United States.
While plaintiffs urged adoption of the commissioner’s opinion and findings, the Government duly excepted to both.
*928 The parties have again briefed their respective positions and have presented oral argument before this panel.
Albeit on somewhat different reasoning, it is held that Commissioner Arens correctly determined that plaintiffs had an equitable right to recover from the Government for the loss of their crops.
The essential facts are summarized here. Complete details are contained in the separately stated findings óf fact accompanying this opinion.
Plaintiffs owned crops, primarily soybeans, growing in 1965 on approximately 8,000 acres of bottom land in southern Missouri and northern Arkansas situated along the St. Francis River, a tributary of the Mississippi, in an area ranging from 22 to 79 miles below the river’s Wappapello Dam and Reservoir, a facility operated and controlled by the U.S. Army Corps of Engineers. The crops in question were destroyed by flooding and the parties are in agreement as to their value at the time of the flood.
The dam, completed in 1941 under authority of section 4 of the Act of June 15, 1986, ch. 548, 49 Stat. 1509, had as its principal objective the protection of downstream landowners from the ravages of devastating floods theretofore common in the area. This legislation, which authorized several different flood control projects, was entitled “An Act for the control of floods on the Mississippi River and its tributaries and for other purposes.”[1]
Structurally, the Wappapello Dam is an earthen fill across the St. Francis River with a 740-foot emergency concrete spillway that crests at an elevation of approximately 395 feet MSL (Mean Sea Level). With its spillway cresting at. that elevation, the dam is capable of impounding 625,000 acre-feet of water in the conically shaped reservoir that was formed behind it. A fixed-position conservation weir at an'elevation of 355 feet MSL is designed to insure a minimum water volume of 38,600 acre-feet in the reservoir.
*929 In order to accommodate the dam’s total water impoundment capability of 625,000 acre-feet, the Government acquired all lands in the reservoir basin up to an elevation of 400 feet MSL — some 5 feet higher than the crest of the spillway. The reservoir area became a popular sports and recreation attraction ; and in due course the Government leased the shoreline lands, beginning at a minimum elevation of 364 feet MSL, to private parties, principally for the erection of fish--ing and boating piers. The more highly elevated Government-owned lands, ranging closer to 400 feet MSL, were leased for agricultural purposes. In all instances, the leases expressly-stated that the lands involved were subject to flooding.
In 1963, in deference to the interests of the shoreline lessees, the Corps of Engineers agreed with the Missouri Conservation Commission that from May 1 to. December 15 of each yéar it would attempt to maintain the water level in the reservoir at approximately .359 feet MSL. Stabilization at that level, it is agreed by all parties to this'suit, bore no relationship to flood control considerations or objectives. .
Three parallel tunnels running through the báse of the dam, each equipped with a 10- by 20-foot electrically operated gate, provide the means for a controlled release of water im- ■ pounded by the dam. With a full reservoir and the gates wide open the three tunnels have a maximum flowage capácity. of 18,000 cubic feet of water per second (cfs).. [1]
The channel capacity of the St. Francis Liver before con-. struction of the Wappapello Dam project was between 3,000 and 4,000 cfs. The original plan for the project called for increasing that capacity to 10,000 cfs by providing a series of levees on each bank of the river below the dam. The levees on the west bank were built according to plan but none were built on the east bank because of right-of-way acquisition difficulties.' Since the levee system was never completed, the channel capacity of the river remained essentially unchanged. Despite that fact, the Corps of Engineers adhered to its original plan for operating the dam. This plan, generally[1] known throughout the local area, consisted simply of a 10,000 cfs year-round ceiling on the rate of water release. Thus, the tunnel gates were-not used to restrict discharge until flowage reached that volume of water — a volume more than twice the *930 actual channel capacity of the river, albeit exactly equal to the capacity that was planned but never achieved.
During the so-called “wet” season in the area (December through July), flowage through the dam tunnels frequently exceeded the 3,000 to 4,000 cfs channel capacity of. the river with consequent, downstream flooding of varying severity.. Such flooding did not cause significant damage, however, be-C cause until 1963 most of the downstream riparian lands were wooded and, to the extent that they were under cultivation the crops were harvested and removed, before the onset of the “wet” season. ■
The growing and harvest season in the area for-crops such as plaintiffs’ primarily spanned the months of . August through November, the so-called “dry” season. As a matter of historical pattern, discharge from the dam during that period had rarely exceeded 4,000 cfs. The record establishes, that between 1941 and 1964 downstream flooding never occurred during the months of August or September, and occurred only .once in- October (1949), and four times in November. (1941, 1951, 1957 and 1958); In the face of this record of experience it was not unreasonable for downstream property owners to clear their woodlands, during the-years 1963-1965, in anticipation of being able to utilize those lands for the production of crops such as soybeans. ■ - •
It was in the context of the above background that the critical events of September 1965 occurred. -
The month began inauspiciously enough. Flowage past the dam was at a rate no greater than 33,0 cfs and the downstream elevation of the river was less than 4 feet, as con-" trasted with a flood stage that ranged from 17 to 20 feet.
The calm was broken,- however, on September 11 and 12 when rains' of unprecedented intensity fell above and below the dam in the aftermath of Hurricane Betsy which-had-struck the Gulf Coast on the 10th and then veered northward. Although more of the same occurred on the 14th, 15th' and 16th, the rate of discharge from the dam still did not exceed 1,600' cfs and the river elevation had not exceeded 13.40 feet. Additional heavy rains fell above and below the dam on the 22nd and by the following day, when it again rained heavily *931 below the dam and moderately above it, the rate of discharge from the dam rose to 6,250 cfs.
It takes approximately 2 days for water released from the dam to reach the closest of plaintiffs’ downstream lands and about! days to reach the farthest.
By September 24 the discharge rate at the dam had risen to 7,000 cfs and elevation of the river had reached flood stage. At that point plaintiffs, who were then experiencing transitory flooding, requested the Corps of Engineers to provide relief by reducing the rate of discharge at the dam.
At the time of plaintiffs’ request for relief, the pool elevation in the reservoir had reached 365.94 feet MSL, a level that was never to be exceeded throughout the entire episode and was almost 29 feet below the spillway crest. In terms of the reservoir’s impoundment capacity, that pool elevation represented an accumulation of 134,080 acre-feet of water, less than 25 percent of the reservoir’s total capacity of 625,000 acre-feet and less than one-third of the 415,700 acre-feet of capacity when the pool elevation is at 385 feet MSL, 10 feet below the crest of the spillway.
In the face of the conditions described above, and fully aware of the 4,000 cfs channel capacity of the river and of the fact that plaintiffs were already undergoing some flooding, the Corps of Engineers refused to make any reduction at all in the 7,000 cfs rate of discharge that was then prevailing. Its sole concession to the plaintiffs’ plight and request for help was to close the tunnel gates to the extent necessary to reduce the maximum possible discharge rate from 10,000 cfs to 7,000 cfs.
Sustained flooding of downstream lands ensued and plaintiffs’ crops were damaged to the extent set forth in H.E. 1624.
Following the events of September 1965, the Corps of Engineers initiated an extended study that culminated in a new seasonal plan of operating procedure for variable flowage control at the Wappapello Dam. The plan, which replaced the single-feature 10,000 cfs year-round flowage ceiling plan that had governed control of the tunnel gates from the inception of the project, was put in effect in October 1967. The new plan applied to the period August 1 through November 30 of each year, that being the historical “dry” season for *932 tbe area which, includes the growing and harvest seasons for such downstream river bottom crops as soybeans. During that 4-month period, the discharge rate at the dam is limited to 3,000 cfs until the pool elevation of the resei'voir reaches 384.74 feet MSL, 10 feet below the spillway crest. Beyond that pool elevation, the discharge rate is increased to 7,000 cfs.
Whatever may be said of the merits of the Corps of Engineers’ actions in operating the dam as it did during the 1965 hurricane crisis,. the1 Government is immunized ■ from legal liability for at least two reasons. First, there is the express provision of the 1928 legislation that originally provided for flood control projects on the St. Francis Fiver to the effect that: “No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters * * [2] Second, there is the specific exclusion from the Federal Tort Claims Act of: “Any claim based upon * * * the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.”[3]
Accordingly, the relevant inquiry becomes whether the plaintiffs have an equitable claim against the United States. While it is true that in this context the word “equity” is used in the sense of broad moral responsibility — what the Government ought to do as a matter of good conscience — it is also true that even under this theory the defendant’s liability must rest on some unjustified act or omission to, act which, caused plaintiffs’ damage. But for that, any award would be a pure gratuity. B. Amusement Co. v. United States, 148 Ct. Cl. 337, 342, 180 F. Supp. 386, 390 (1960). Put otherwise, it has been said that the test of “equity” is whether the claim asserted would be recoverable against a private party. Estates of E. L. Armiger, et al. v. United States, 168 Ct. Cl. 379, 384, 339 F. 2d 625, 628 (1964).
Because the abatement of the hurricane rains approximately coincided with plaintiffs’ requests to the Corps of *933 Engineers for flood relief, a hindsight view of the evidence shows that had the rate of water discharge at the dam been reduced to 3,000 cfs, generally in keeping with the known channel capacity of the river, plaintiffs’ crops would have been saved and the pool elevation of the reservoir would not have been increased significantly. Without more, however, a bare showing that crop damage could have been avoided had the dam been operated differently does not create Government liability under the recognized standard of equitable entitlement previously described. There remains for consideration the dispositive element of causative negligence on the part of the Government.
It is true, as the Government quite correctly insists, that it would be wholly unwarranted to conclude that the Corps of Engineers acted negligently in failing to reduce the rate of discharge at the dam because it should have more accurately foreseen the stoppage of hurricane rains which were practically unprecedented for the area. The Government negligence that so clearly emerges from the present record is in no way dependent on anything so tenuous as an asserted lack of meteorological prescience.
However, given the weather conditions with which it was confronted in September 1965, the Corps of Engineers was grossly negligent in advisedly refusing to operate the dam in any manner consistent with its intended function and purpose. Undeniably, flood control was the predominant, if not exclusive purpose for which federal funds were appropriated to the construction of the Wappapello Dam and Reservoir. An examination of the relevant legislation permits no other conclusion.
A comparison of the reservoir’s storage capacity with the volume of impoundment permitted by the Corps of Engineers during the emergency of September 1965 reveals that, as operated, the flood control capabilities ■ of the dam were never even approached. The highest pool elevation registered in the reservoir at any time during September 1965 was 365.94 feet MSL (28.80 feet below spillway crest) with a resulting impoundment of 134,080 acre-feet of water in the reservoir. This volume of impoundment contrasts with *934 625,000 acre-feet at spillway level and 415,700 acre-feet at 385 feet MSL (10 feet below spillway level).
.At the time of the 1965 flood emergency, the Corps of Engineers had operated this dam and reservoir complex for almost 25 years. While it could not be expected to foresee the end of the hurricane rains, it had accumulated ample background and experience in correlating the relationship between rainfall and the pool elevation of the reservoir. Accordingly, on September 24 when the Corps of Engineers, knowing that plaintiffs’ crops were being flooded, nonetheless declined to reduce the rate of discharge at the dam to 3,000 cfs, a flowage that could have been accommodated by the channel capacity of the river, it did so with the knowledge that had the rate been reduced to that level the pool elevation of the reservoir would not have reached the spillway crest unless it rained more than it already had during the entire month of September.
In summary, the manner in which the Engineers elected to operate the control gates in the dam bore no discernible functional relationship to the achievement of flood control objectives and can only be rationalized in light of its 1963 compact with Missouri Conservation Commission to maintain a 359-foot MSL pool elevation in the reservoir for the benefit of sports and recreation enthusiasts and its acknowledged concern for the welfare of the lessees of Government lands in the reservoir basin from 364 to 400 feet MSL — lessees whose lease indentures specifically forewarned of flooding possibilities.
That prevention of downstream flooding was clearly subordinate to the above considerations in the eyes of the Corps of Engineers is further indicated by the fact that it was not until 1967 that pre-planned discharge at the dam was ever limited to the channel capacity of the river. At all times theretofore the control gates were attuned to a hypothetical channel capacity of 10,000 cfs that never materalized and was in fact 214 times greater than actual channel capacity.
Finally, the Government suggests that plaintiffs should be denied recovery on the theory that they assumed the risk of flood damage by planting soybeans in areas where they knew that flooding had occurred in the past.
*935 Of course it is true that simply by building a flood control dam the Government does not become a guarantor against downstream flooding. Thus, persons such as plaintiffs are and should be held to assume the risk of damage from flooding that occurs despite the exercise of reasonable care in the operation of the flood control facility.
On the other hand, in the context of equitable entitlement, these plaintiffs and persons like them may justifiably assume that when the Government builds a dam for the announced purpose of flood control, the completed facility will be operated in a manner reasonably calculated to effectuate that purpose. Such persons are not, however, obliged to shoulder the risk that, without notice to them, the Government might sometime decide that, instead of operating the facility in a manner that accords unqualified priority to prevention of downstream flooding, it will compromise the facility’s capacity to control flooding in order to promote other interests, such as the recreational suitability of a reservoir that was initially built for the predominant purpose of impounding run-off waters which would otherwise exceed a river’s channel capacity and cause flood damage. The evidence demonstrates most convincingly that this is what occurred here and plaintiffs cannot conscionably be held to have assumed the risk of their consequent loss.
For the above reasons, the trial commissioner’s conclusion as to the validity of plaintiffs’ equitable claims is affirmed, and they are therefore due from the United States the respective amounts totaling $295,790.24, set forth in H.E. 1624 of the 90th Congress, 1st Session, reproduced in finding 1 accompanying this opinion.

 Sections 3 and 10 of the Act of May 15, 1928, eh. 569, 45 Stat. 534, 536, 538.

 Section 421 of the Federal Tort Claims Act, eh. 753, 60 Stat. 842, 845.