Larry LAND, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Congressional Reference No. 1–88.

United States Court of Federal Claims.

Oct. 13, 1993.

Murray Ogborn, Denver, CO, for plaintiffs.

J. Charles Kruse, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, J. Patrick Glynn, Director, for defendant. Major John M. Fomous, Dept. of the Army, of counsel.

## REPORT OF THE HEARING OFFICER

ROBINSON, Judge:

This matter is before the court on defendant's motion for summary judgment. Defendant moves the court, pursuant to RCFC 56, for summary judgment on the ground that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Plaintiffs challenge the motion, urging that the rec-

ord does reflect genuine issues of material fact precluding summary judgment. For the reasons stated below, defendant's motion is denied.

### Factual Background

In 1942, defendant, through the United States Army, established the Rocky Mountain Arsenal (RMA or Arsenal), located near Denver, Colorado, to manufacture toxic chemical and incendiary munitions.[1] Shortly thereafter, one of the RMA's primary objectives became the demilitarization of obsolete hazardous and toxic munitions. Portions of the Arsenal were also leased to private industry for chemical manufacturing. From 1942 through 1955, waste from the manufacturing and demilitarization of munitions and commercial chemicals were disposed of in Basin A, an evaporation basin located in the center of the Arsenal.[2] The basin was designed to utilize high alkalinity and high ph to precipitate out soluble salts and irons in order to form an impermeable blanket over the soil.

During the summer of 1951, the RMA was informed by farmers to the northwest of the Arsenal of crop damage from ground water contamination. Similar complaints surfaced again in 1954.[3] As a result of these complaints and subsequent claims for damages, the Department of the Army took the following actions:

1. Retained a firm of consulting engineers to investigate the problem of ground water contamination;
2. Requested the U.S. Geological Survey (USGS) to study water quality on the Arsenal and on neighboring farm lands; and
3. Contracted the University of Colorado to undertake plant bioassay, chemical and geological studies to determine the identity and source of contaminants causing crop damage. See P.App. 4 at 1–3 to 1–4.[4] Most of the information gathered, as a result of the Army's efforts, was done by monitoring wells both on and off the Arsenal.

The USGS and University of Colorado each concluded in their studies that the primary contaminants were sodium and chlorides, which were carried off-post by an underground water plume in a northwesterly direction. Basin A was identified as the likely source of the contamination.[5] As a result of the studies, the Army constructed Basin F, located northwest of Basin A. This basin consisted of approximately ninety-six acres and was constructed of asphalt and lined with a waterproof membrane. From early October 1955 through 1975, all of the RMA's chemical wastes were pumped to Basin F. Id. at 1–4.

The RMA halted monitoring in 1960. It refused to resume testing until 1974–75, despite the fact that a report on groundwater contamination in the relevant area, by the U.S. Department of Health, Education, and Welfare (HEW), completed in December 1965, recommended that the well-monitoring programs of the Tri–County Health Department, the Colorado State Department of Health, and RMA itself be continued. P.App. 9, Ex. 2 at viii; P.App. 11 at 52–54, 107–08, and 129–30. HEW stated:

Ground water is used extensively in the area for public, domestic, industrial and irrigation supplies. The principal source of large ground-water supplies is the shallow valley-fill deposits which are very susceptible to contamination. The rapidly expanding urban and industrial growth of the area has resulted in continued development of water supplied from ground-water sources.

1. This facility covers twenty-seven square miles. At the time it was established, it was surrounded by rural farm land. The manufacturing, disposal and demilitarization sites in issue in the suit are located more than a mile inside the perimeter of the Arsenal.

2. Section 36 of the RMA.

3. The complaints came shortly after the RMA constructed a plant to produce GB nerve gas. The plant manufactured this gas until 1957.

4. "P.App." refers to plaintiffs' appendix filed on April 10, 1992.

5. It is noteworthy that the authors of these studies did not investigate the possibility of ground water flow to the north of Basin A.

748

The purpose of the ground-water study was to determine sources and extent of pollution in the water-bearing formations in the area. In assessing these conditions the geology and water-bearing characteristics of the aquifers were considered.

P.App. 9, Ex. 2 at 1. Focusing on the aquifer underlying the Arsenal, HEW concluded that:

Contamination of the aquifer is likely to persist for many decades if the trend of relatively small decreases in chloride concentrations continues.

*Id.* at 28. Monitoring was re-instituted shortly after defendant initiated two phases of "Project Eagle," which was implemented to demilitarize mustard-associated weapons, as well as various other bombs containing GB nerve gas, by incineration.

In 1965, the Army Environmental Hygiene Agency recommended that steps be taken "to eliminate Lake 'F' as soon as possible, and thereby remove much of the present environmental hazard of exposed surface storage of toxic wastes." P.App. 10 at 3–4. By 1969, there was evidence that Basin F was leaking; indeed, a physical inspection reflected that sections of the protective membrane were absent. *Id.* at 11–12. Thus, by the spring of 1970, the Army understood that it was operating Basin F on the premise that it was leaking. *Id.* at 13.

In late 1971, plaintiff Larry Land purchased the seventy-five acre family farm from his father Adam Land. The farm is located one mile north of the RMA. In April of the following year, Larry Land drilled a new water well. This well was connected to the house-trailers of plaintiffs Phinney and Land and was used for domestic and livestock purposes. All sixteen plaintiffs in this action lived on the Land farm. Plaintiff William L. Phinney Sr., now deceased, was a hired hand of Larry Land at this time. The Phinney plaintiffs resided on the southern portion of the Land property.

Shortly after his purchase of the farm, Larry Land began purchasing cattle for a stock-feeding operation. The Land family's plan was to purchase dairy calves and yearlings, feed them for an average of two years, and then sell them as replacements in dairy herds. Soon after the new well was drilled, the calves began showing signs of illness. Indeed, the youngest calves, which were fed a formula containing 90% well water, became ill within two weeks of ingesting the formula, displaying symptoms typical of pneumonia. As their condition deteriorated, the calves lost the ability to stand, experienced blistering and the loss of eye-sight, hair, and teeth. Death normally followed within five to seven days. Many of the animals were destroyed upon becoming unable to stand. Of the 520 calves and yearlings Larry Land purchased, one-half died or had to be destroyed, the remainder were sold for slaughter because of their condition. Plaintiffs rely on a report by Dr. Frederick W. Oehme, D.V.M., Ph.D., which opines that the cause of the death or eventual destruction of all but three of the calves was the presence in the well water of the man-made compound DIMP[6] and its breakdown product IMPA. P.App. 14 at 1.

During this same period of time in 1972, and afterwards, all sixteen plaintiffs bathed in and consumed water from the well and, obviously, were exposed to the air. Each asserts that he or she has endured abnormal medical histories. Plaintiffs cite symptoms such as: lethargy, headaches, airway irritation, eye irritation, bronchial irritation, nausea, diarrhea, and mental and emotional changes. They rely on a recent report by Dr. Daniel T. Teitelbaum, M.D., concluding that the cause of the health problems suffered by plaintiffs and Larry Land's calves was DIMP and IMPA contamination of the Land well water and the air. P.App. 15 at 5–6; *see also* P.App. 14. Moreover, Dr. Teitelbaum concludes that:

Review of the records which were supplied to me establishes unequivocally

6. DIMP, diisopropylmethylphosphonate, is a persistent compound produced in small quanti-

ties (less than 3%) during the manufacture of GB.

that the Land family's groundwater was contaminated with materials from the Rocky Mountain Arsenal. In particular, the finding of DIMP ... establishes beyond any question that the source of the material in the groundwater under the Land's property and in their drinking water and hygiene water wells was the Rocky Mountain Arsenal. No other source of this material is conceivable in that area. This finger-printed chemical establishes without any question that the toxic material which reached the Land family had, as its source, the Rocky Mountain Arsenal GB manufacturing facility. In addition, the finding of IMPA, a metabolite of DIMP, further identifies the material as having a source in the Rocky Mountain Arsenal.

P.App. 15 at 3. Unfortunately, the lack of additional information precluded Dr. Teitelbaum from offering more in the way of an opinion relating to defendant's obligation, if any, to prevent the contamination. *Id.* at 2.

In late 1972, Larry Land asserted a claim against Shell Chemical Company (SCC) for the death of cattle, diminution of property value, and personal injuries as a result, allegedly, of contaminated well water.[7] The action was dismissed and Larry Land pursued other administrative remedies against the United States.

In May 1974, the RMA acknowledged the detection of DIMP and dicyclopentadine (DCPD), a chemical used in the production of insecticides, in surface water drainage from a marshy bog on the northern boundary of the Arsenal. Detection of these two compounds resulted in the following actions being taken by defendant:

1. More wells were drilled and the well monitoring program was expanded to include tests for these and other compounds;

2. In September of 1974, a dike was constructed north of the marshy bog to eliminate off-post surface drainage; and

3. RMA and Ft. Detrick established programs to determine the effect of DIMP on wheat growth.

*See* P.App. 4 at 1–4 to 1–5.

In December 1974, the Colorado Department of Health detected DIMP in a well near the city of Brighton, located seven miles north of the RMA and six miles north of the Land farm. *See* P.App. 4 at 1–1. Although the quantity of DIMP detected was small, it indicated that ground water traveled in a northerly direction. This detection of contamination of the ground water resulted in the State of Colorado Department of Health issuing three cease and desist orders on April 7, 1975, against SCC and RMA. The orders required that:

1. SCC and RMA immediately stop off-post discharge (both surface and subsurface) of DIMP and DCPD;

2. Take action to preclude future off-post discharge (both surface and subsurface) of DIMP and DCPD;

3. Provide written notice of compliance with item (1);

4. Submit a proposed plan to meet the requirements of item (2); and

5. Develop and institute a surveillance plan to verify compliance with items (1) and (2).

*See Id.* at 1–4 to 1–6.

Activities on the Arsenal have resulted in one of the worst hazardous waste pollution sites in the country, and Basin F is only a small portion of the problem.[8] Army officials have estimated that the twenty-seven square mile Arsenal has 120 contamination sites which contain huge quantities of liquid and solid wastes, some of which are unique because of the mixture of private

---

7. The record before this court is unclear as to whether the action against SCC involved an allegation that injuries were suffered as the result of contaminated air.

8. The Arsenal is among the federal sites grouped as the number two priority on the National Priorities List (NPL), an EPA compiled list which prioritizes CERCLA sites for cleanup based on the relative risk or danger to public health or welfare or the environment. *See* CERCLA § 105(a)(8), 42 U.S.C.A. § 9605(a)(8). This list is published at 40 C.F.R. pt. 300 app. B (1991).

herbicide and pesticide manufacturing activities with Army munitions manufacturing activities. *See Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1531 (10th Cir.1992). An optimistic solution to these problems began in 1984, when the Army, with guidance from EPA, began a Remedial Investigation and Feasibility Study (RI/FS) pursuant to CERCLA § 104, 42 U.S.C.A. § 9604. *Id.* The purpose of this study was to identify contamination sites and determine the feasibility of proposed responses. Ultimately, the Army identified fourteen specific sites which needed Interim Response Actions (IRAs) to stop the spread of contaminants so as to protect human health and the environment. *Id.* at 1532. As indicated by their classification, these actions were to take place in the interim, before the implementation of a permanent, remedial response. Basin F was among the fourteen priority sites.

The House of Representatives referred this case to this court on September 22, 1988.[9] Plaintiffs filed an amended complaint on October 15, 1990, requesting legal and equitable relief. Plaintiffs allege five counts in the amended complaint: (1) negligence; (2) strict liability, ultrahazardous activity and inherently dangerous activity; (3) trespass; (4) nuisance; and (5) deceit based upon concealment. The parties have engaged in extensive discovery culminating in defendant filing the instant dispositive motion.

## DISCUSSION

This case is before the court pursuant to 28 U.S.C. § 1492 (1988) which provides that "[a]ny bill, except a bill for a pension, may be referred by either House of Congress to the chief judge of the United States [Court of Federal Claims] for a report in conformity with section 2509 of this title." Under section 2509, the hearing officer is charged with proceeding "in accordance with the applicable rules to determine the facts ... [The hearing officer] shall append to his findings of facts conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any legally or equitably due from the United States to the claimant." 28 U.S.C. § 2509 (1988). The applicable rules are "such rules of the United States [Court of Federal Claims] as may be required to determine the facts." RCFC, Appendix D, at 8. The court rules require that "[t]he hearing officer shall find the facts specially." *Id.*

Defendant is of the position that RCFC 56 is applicable in this proceeding and moves the court for summary judgment, arguing that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law.[10] More spe-

---

**9.** H.R. 816 states:

A BILL

For the relief of Larry Land, Marie Land, Brian Land, Keith Land, Patricia Vandenberg, Lorri Vandenberg, James W. Land, Lois Land, Tamra Lee Land, Sandra Gay Land, Vincent James Land, Viola Hollenbaugh, William L. Phinney, Senior, Emily V. Phinney, Lora Phinney, and William L. Phinney, Junior.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $____ to Larry Land, Marie Land, Brian Land, Keith Land, Patricia Vandenberg, Lorri Vandenberg, James W. Land, Lois Land, Tamra Lee Land, Sandra Gay Land, Vincent James Land, Viola Hollenbaugh, William L. Phinney, Senior, Emily V. Phinney, Lora Phinney, and William L. Phinney, Junior. This sum shall be in full and complete satisfaction of all their claims against the United States based upon

health problems and other related injuries resulting from the operations and activities at the Rocky Mountain Arsenal, Denver, Colorado, conducted under the auspices and control of the United States Army.

H.Res. 61 states:

RESOLVED, That H.R. 816 entitled "A bill for the relief of Larry Land, Marie Land, and others," together with all the accompanying papers, is hereby referred to the Chief Commissioner of the Court of Claims pursuant to section 1492 and 2509 of title 28, United States Code, for further proceedings in accordance with applicable law.

**10.** Although not raised by the plaintiff and although no discussion is necessary here as it does not change the outcome of this motion, the court questions the propriety of a summary judgement motion in a congressional reference case where the hearing officer is charged with finding facts specifically and the moving party only concedes, rather than stipulates to, facts for a limited purpose.

cifically, defendant argues that plaintiffs are limited to proving negligence in order to prevail in this matter, and that they have failed to offer evidence of such a claim. Plaintiffs counter, arguing that the reference in this case allows a broader basis for recovery than negligence. Further, plaintiffs argue that the record currently before this court reflects genuine issues of material fact precluding summary judgment.

RCFC 56, which follows Rule 56 of the Federal Rules of Civil Procedure very closely, imposes an *initial* burden on the moving party to inform the court of the basis for its motion and to *demonstrate* through its filings that no genuine issue of material fact exists as to its claim for relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the evidence in support of the motion does not establish the *absence* of a genuine issue, summary judgment must be denied, even if no opposing evidence is presented. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). In viewing the movant's evidence, the rule also requires that all factual inferences drawn from such evidence be viewed in the light most favorable to the non-movant, *i.e.*, plaintiffs in the instant matter. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 88 L.Ed.2d 176 (1962); *Bromley Contracting Co. v. United States*, 15 Cl.Ct. 100, 104 (1988). Furthermore, any doubt as to whether a genuine issue of material fact exists will be resolved in favor of the non-moving party. *Adickes*, 398 U.S. at 158, 90 S.Ct. at 1608. Thus, "it is axiomatic that, if the moving party fails to meet its initial burden under Rule 56(c), it has no entitlement to summary judgment." *Bromley Contracting*, 15 Cl.Ct. at 104; RCFC 56(c).

On the other hand, once the moving party adequately meets its *prima facie* burden in establishing that no genuine issue of material fact exists, the burden of going forward shifts to the non-movant. RCFC 56(f). The non-moving party may not discharge this burden by "cryptic, conclusory or generalized responses ... or by remaining silent." *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). Rather, the party must present specific and credible facts that either tend to establish all the necessary elements of its case or its position, or raise a genuine issue of material fact. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552. A dispute is *genuine* only if, on the entirety of the record, a reasonable finder of facts could resolve a factual matter in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). Material facts are those which the substantive law identifies as affecting the outcome of the suit. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

In a congressional reference, plaintiffs may assert a legal or equitable claim against the government.

A. *Legal Claims.* The term legal claim carries no special meaning in a congressional reference proceeding; a legal claim arises from substantive law, *i.e.*, the Constitution, a statute, a regulation, or some principle of common law, and is based on the invasion of a legal right. *Spalding & Son, Inc. v. United States*, 28 Fed.Cl. 242, 247 (1993); *White Sands Ranchers v. United States*, 14 Cl.Ct. 559, 565 (1988).

Plaintiffs have no legal claim to relief; plaintiffs' tort claims are barred by statutes of limitations. The time period for this court's general statute of limitations, 28 U.S.C. § 2501, is six years and the statute of limitations under the Federal Torts Claims Act, 28 U.S.C. § 2401(b), (FTCA) is only two years. Plaintiffs' claims accrued, at the latest, sometime in the mid–1970s. Regardless of which statute is applied, plaintiffs are barred from legal relief.[11]

---

11. The Colorado Department of Health informed Larry Land, in correspondence dated June 11, 1975, of the presence of chemicals in the house well. P.App. 16. The Tri–County District Health Department informed Larry Land of chemicals in the well water on July 7, 1975. It indicated the RMA as the source of contamination. *Id.* Moreover, since January

B. *Equitable Claims.* The principles of right, justice and morality create equitable claims. *United States v. Realty Co.*, 163 U.S. 427, 440, 16 S.Ct. 1120, 1125, 41 L.Ed. 215 (1896), *cited with approval in, Armiger Estates v. United States*, 168 Ct.Cl. 379, 339 F.2d 625, 628 (1964). "The term equity in this context is used in the sense of broad moral responsibility, what the government ought to do as a matter of good conscience." *B. Amusement Co. v. United States*, 148 Ct.Cl. 337, 342 (1960) (citations omitted); *Spalding*, 28 Fed.Cl. at 250.

> In its broadest and most general signification, equity denotes the spirit and habit of fairness, justness, and right dealing which would regulate the intercourse of men—the rule of doing to all others as we desire them to do to us; or as it is expressed by Justinian—"to live honestly, to harm nobody, to render every man his due." It is therefore the synonym of natural right or justice.... It is grounded in the precepts of the conscience, not in any sanction of positive law.

*Gay St. Corp. v. United States*, 130 Ct.Cl. 341, 350 n. 1 (1955). Equitable claims are those:

> Which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against a private individual. The nation, speaking broadly, owes a "debt" to a [party when its] claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the honor of an individual, although the debt could obtain no recognition in a court of law.

*Realty*, 163 U.S. at 440, 16 S.Ct. at 1125. Equity, thus, contemplates a remedy to a claim in a variety of circumstances where relief would be otherwise unavailable in a traditional juridical setting, such as when there is no remedy under existing law or the remedy is time barred by a statute of limitations. *See Spalding*, 28 Fed.Cl. at 250. While such a claim, like a legal claim, may be founded on the Constitution, a statute, a regulation, or a common law principle, such bases are not necessary to warrant relief in equity. Nevertheless, most equitable claims are based on traditional principles, in which the standard to be applied are those that govern the subject area of the law generally bearing on the claim. *See, e.g., Kochendorfer v. United States*, 193 Ct.Cl. 1045, 1056, 1970 WL 6465 (1970) ("[t]o ascertain the proper standard for fixing liability [on an equitable claim], it is helpful to take account of the principles governing the particular area of law bearing on the claims"). In judging whether there is an equitable claim, however, these legal guidelines need not be rigidly applied. Rather, the particular facts may be examined to determine whether the plaintiffs suffered an invasion of rights for which compensation is due them. *White Sand Ranchers*, 14 Cl.Ct. at 570.

In any event, "[a]n equitable claim in a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrong doing] on the part of governmental employees, any award herein would be a gratuity." *Shane v. United States*, 3 Cl.Ct. 294, 304 (1983) (citations omitted). A gratuity is, in essence, a gift, *i.e.*, an award or payment for which no legal or equitable entitlement has been established. *White Sands Ranchers*, 14 Cl.Ct. at 565.

To obtain a favorable recommendation from this court on any equitable claim, plaintiffs must show: (1) that defendant, acting through the United States Army, committed a negligent or wrongful act; and (2) this act caused damage to the plaintiffs. *California Canners & Growers Ass'n v. United States*, 9 Cl.Ct. 774, 785 (1986); *Lance Indus., Inc. v. United States*, 3 Cl.Ct. 762, 779 (1983); *Shane*, 3 Cl.Ct. at 304. For defendant to succeed on

1975, Larry Land has filed various claims against the government alleging injuries from consuming contaminated well water. P.App. 4.

its motion for summary judgment, it must show that there is no genuine issue of material fact and any award recommended by the court would amount to a gratuity.

■ Defendant first contends that plaintiffs' recovery on any of their claims is dependent on a showing of negligence by the Army. The reference to this court is not so limited, nor is the applicable law.

In addition to negligence, plaintiffs may recover upon a showing of "wrongful" conduct. When this word was added to the FTCA, it provided for liability for "wrongful" as well as "negligent" acts. The Supreme Court in *Dalehite v. United States*, 346 U.S. 15, 45, 73 S.Ct. 956, 972, 97 L.Ed. 1427 (1953), pointed out that the addition of this word was intended to include situations involving " 'trespasses' which might not be considered strictly negligence." What the Court suggested in *Dalehite*, it later held in *Hatahley v. United States*, 351 U.S. 173, 181, 76 S.Ct. 745, 751–52, 100 L.Ed. 1065 (1956). In *Hatahley*, federal agents improperly invoked a Utah abandoned horse statute to justify the destruction of Indian owned horses grazing on public lands. That was considered to be a "wrongful" trespass. *Id. See also United States v. Gaidys*, 194 F.2d 762 (10th Cir. 1952) (finding a trespass where the plaintiff failed to prove that burning parts and fuel falling from a crashed United States Air Force plane upon plaintiff's property causing damages was due to negligence). The treatment of "wrongful" action under the FTCA is persuasive authority for similar treatment, by this court of "wrongful" action in a congressional reference.

This court finds it conceivable that there is an area of non-intentional, non-negligent, "wrongful" action, for which the government may be held liable in equity in a congressional reference. Though ·*Dalehite*, *Hatahley*, and *Gaidys*, may be narrowly construed as permitting liability for only a wrongful trespass, this court is not convinced that such a limitation is absolutely required with respect to a congressional reference. Indeed, as plaintiffs noted at oral argument, "wrongful act" has been defined as "[a]ny act which in the ordinary course will infringe upon the rights of another to his damage, unless it is done in the exercise of an equal or superior right. [The t]erm is occasionally equated to [the] term 'negligence,' but has been considered [a] more comprehensive term, including criminal, willful, wanton, reckless and all other acts which in ordinary course will infringe upon rights of another to his damage." *Black's Law Dictionary* 1446 (5th ed. 1979). Moreover, even though this court accepts the more recent legal precedents that equitable relief in a congressional reference necessarily must rest on the existence of some type of an unjustified act or omission, *see, e.g., California Canners & Growers Ass'n*, 9 Cl.Ct. at 786 (finding that a recommendation of an award without fault in a congressional reference would be 'erroneous as a matter of law'), despite earlier viable authority finding that an equitable claim may arise without fault, this court is not convinced that a technical demonstration of negligence is required. Indeed, the reference in the instant matter is not so limited.[12] Therefore, this court shall not bind plaintiffs to a preliminary showing of all elements required to support a strict negligence claim. Plaintiffs are advised, however, that to stray from the principles governing much of their claims is to venture into largely unchartered waters. This court shall not do so without a compelling basis.

■ This court's Order of September 13, 1990, also does not limit plaintiff to a strict showing of negligence. That Order concluded that in order to recover on an equitable claim, plaintiffs must show that: (1) the government committed a wrongful act; and (2) this act caused damage to plaintiffs. As discussed this court does not believe that only strictly negligent acts should be considered wrongful. To the extent that Order may be construed otherwise, it is modified in accordance with this Opinion.

**12.** *See supra* note 9.

Defendant also contends that plaintiffs' claims sounding in strict liability based on ultrahazardous or abnormally dangerous activity must fail because an equitable claim must be based on a showing of fault. While the court agrees that fault must be shown, it does not agree that plaintiffs' claims must necessarily fail.

■ Strict liability commonly means "liability that is imposed on an actor apart from (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care, i.e. actionable negligence." W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 75 at 534 (5th ed. 1984) [hereinafter PROSSER AND KEETON]. While strict liability is often referred to as liability without fault, as PROSSER AND KEETON points out, this reference can be misleading. *Id.* For example, PROSSER AND KEETON illustrates that "it might be quite as easy to say that one who conducts blasting operations which may injure a neighbor is at 'fault' in conducting them at all, and is privileged to do so only in so far as he insures that no harm shall result, as to say that he is not at fault, but is liable nevertheless." *Id.* at 537. Likewise, it is conceivable that the operator of an ultrahazardous or abnormally dangerous activity may be at fault for conducting such activity under the attendant circumstances whereby such activity may be "wrongful" within the meaning of a congressional reference. As stated above the court conceives that there may be an area of non-intentional, non-negligent, "wrongful" action, for which the government may be held liable in equity in a congressional reference. Thus, although the court will not hold defendant liable with no showing of fault whatsoever, it is conceivable that conducting ultrahazardous or abnormally dangerous activity may be a "wrongful" act for which the government is at fault.

■ In regard to whether the activity at the RMA constitutes ultrahazardous or abnormally dangerous activity, defendant has failed to convince the court that Colorado would not consider it such. Defendant has been disposing of toxic chemicals and incendiary munitions since 1942 in a facility located a few miles from the city of Denver, seven miles from the city of Brighton, and within a few miles of farmland such as plaintiffs'. Defendant was aware as early as 1951 that its chemical disposal techniques posed a risk to neighboring farmers. In the 1950's, the Army began receiving studies and reports finding that contaminants from the RMA were polluting land to the northwest of the Arsenal. The Army also received reports outlining recommendations to stop the polluting. The Army ignored many of the recommendations, however, including one in 1965 to discontinue use of Basin F. The record reveals further that the Army knew, as early as 1969, that Basin F was leaking, yet it took little or no immediate action to resolve the problem. Furthermore, deposition testimony indicates a "tracer" could have been used to detect off-post contamination, but was not. P.App. 11 at 52. In addition, the record indicates that defendant conducted off-post monitoring tests after complaints in the 1950's, but discontinued this activity in 1960, and failed to resume testing until 1974 or 1975. Moreover, there is little evidence in the record indicating why another disposal area, such as one in the desert far from populated areas, would not have been more appropriate. Indeed, the U.S. Court of Appeals for the 10th Circuit in *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1545 (10th Cir.1992), stated that Colorado could consider such activity ultrahazardous or abnormally dangerous. While plaintiffs still have the burden of proving at trial that such activity would amount to ultrahazardous or abnormally dangerous activity in Colorado, viewing all factual inferences in favor of plaintiffs, for purposes of this motion, this court accepts that the manufacture and disposal of toxic munitions is ultrahazardous or abnormally dangerous activity.

■ Defendant also contends that plaintiffs' claims based on ultrahazardous or abnormally dangerous activity must be denied as outside the scope of this court's September 13, 1990 Order, and because the

activity at the RMA was carried on pursuant to a public duty imposed upon them.

According to defendant, Memorandum of Approval No. 438 dated May 12, 1942, prepared under the name of Robert P. Patterson, Under Secretary of War, indicating approval of the "establishment of a new arsenal at Denver, Colorado, for the production of certain gases and loading facilities" establishes a public duty. *See* Defendant's Reply Brief in Support of Motion for Summary Judgement, exhibit R. In essence, defendant contends that since legislation established the RMA, it was operating pursuant to a public duty imposed by the legislature and, thus, should not be liable for its activities. Such situation is described by PROSSER AND KEETON stating:

> There are certain conditions under which conduct which would otherwise result in strict liability may be privileged. The most obvious one is that of a sanction given by statutory authority, or by a well defined local law.... In the absence of a provision expressly preserving the defendant's liability for any resulting damage, the courts have on occasion interpreted the statute as condoning the consequences in advance, and have refused to hold the defendant liable for doing what was authorized.... The tendency in the later cases has been to avoid [concluding a party is not liable], by strict construction of the authorizing statute, or by finding an implied condition that there shall be liability, or that the manner of doing the work, or the resulting damage itself, are not authorized or necessary consequences of the sanctioned work.

PROSSER AND KEETON at 567. The defendant has failed to show any special circumstances evidencing an intent by the legislature to relieve the government of liability. Generally, authorization to engage in abnormally dangerous activity does not in and of itself demonstrate an intention to relieve liability. *See McLane v. Northwest Natural Gas Co.*, 255 Or. 324, 467 P.2d 635, 641 (1970). Particularly, defendant has failed to show evidence of an intent to relieve the government, including the

RMA, of liability for the "destruction" of toxic munitions. Indeed the Memorandum of Approval only established their "production." While one may argue destruction necessarily follows production, strict construction of the memorandum does not evidence an intent to relieve liability for either the production or destruction of toxic munitions. Moreover, defendant has not shown that its manner of storing and disposing of toxic munitions was authorized, or that any resulting damages were a necessary consequence of that activity.

Even assuming that defendant was operating the RMA pursuant to a public duty, this defense may not be available to defendant in a congressional reference. The Court of Claims has previously considered whether a congressional reference is a waiver of similar defenses or privileges, such as sovereign immunity. In *Mizokami et al. v. United States*, 188 Ct.Cl. 736, 414 F.2d 1375 (1969), the Food and Drug Administration seized and condemned vegetables after finding the vegetables contaminated, a finding which later proved to be in error. The court granted relief apparently on the theory of negligent misrepresentation, despite the FTCA which reserves sovereign immunity for negligent misrepresentation. After reviewing the legislative history of the referencing legislation, the *Mizokami* court found the referencing legislation constituted a waiver of sovereign immunity which defendant would otherwise have been able to claim under the FTCA, and a concession of liability. *Id.* at 743–44, 414 F.2d 1375. According to the court it "seems certain that the sovereign immunity bar was lifted by the provision that 'jurisdiction is hereby conferred' on this court to 'hear, determine, and render judgement' on plaintiffs' claims.... To hold otherwise would be to presume that Congress passed the bill in question merely to send plaintiffs to this forum for a ritual confirmation of the *Neustadt* rule [that the FTCA barred such claims] and concomitant dismissal of their petition." *Id.* at 743, 414 F.2d 1375.

Similarly, in *Sperling & Schwartz, Inc. v. United States*, 218 Ct.Cl. 625 (1978), the

court found that the defense of absolute privilege which shields a government agency from liability for an employee's statements made in his official capacity was tantamount to sovereign immunity, but was not allowed in a congressional reference.

The referencing statute in the present case contains no concession of liability. However, Congress would not have needed to refer this case to the court for "claims against the United States based upon health problems and other related injuries resulting from the operation and activities at the Rocky Mountain Arsenal," [13] merely to affirm that the FTCA or RMA enabling legislation barred any recovery for liability arising out of the operation of the RMA.

Thus, defendant has failed to convince the court that the reference precludes recovery based on ultrahazardous or abnormally dangerous activity. The court reiterates that it is not opening the door to liability of the government without any showing of fault whatever. Rather, defendant has failed to convince the court that operation of an ultrahazardous or abnormally dangerous activity in this instance and under the attendant circumstances, i.e., a few miles from working farmland with knowledge that the basin was leaking, is not a "wrongful" act and that compensation for injuries resulting from such activity would amount to a mere gratuity. As this court finds that such activity might be considered "wrongful," the defendant's conduct falls within the scope of a congressional reference, and the September 13, 1990 Order. However, plaintiffs are cautioned that they must still prove at trial that such activity is wrongful and that it caused injury.

Assuming that to prevail plaintiffs must demonstrate strict negligence, defendant next contends that plaintiffs have failed to produce any evidence of the Army's negligence.

A plaintiff must show the following to prove common law negligence in Colorado: [14] (1) the existence of a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) the breach actually and proximately caused the injuries; and (4) that the plaintiff actually suffered injuries. *Leake v. Cain,* 720 P.2d 152, 155 (Colo.1986); *Turner v. Grier,* 43 Colo.App. 395, 608 P.2d 356, 358 (1979).

"The question of whether a defendant owes a plaintiff a duty to act to avoid injury is a question of law to be determined by the court." *Smith v. Denver,* 726 P.2d 1125, 1127 (Colo.1986); *accord Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313, 317 (Colo.1980); Restatement (Second) of Torts § 328B (1965). "The court determines, as a matter of law, the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection." *Metropolitan,* 621 P.2d at 317. In determining whether the law imposes a duty on a particular defendant, many factors should be considered. These factors may include, for example, "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the [defendant's] conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the [defendant]." *Smith,* 726 P.2d at 1127. Other considerations may also be relevant, depending on the circumstances of each particular case. *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987). No one factor is controlling.

It is axiomatic that in engaging in a particular activity every person is "bound to exercise that reasonable care and caution which would be exercised by a reasonably prudent and cautious person under the same or similar circumstances." *Denver Consol. Elec. Co. v. Simpson,* 21 Colo. 371, 41 P. 499, 501 (1895). Under this

---

**13.** *Supra* note 9.

**14.** For a determination of negligence, or any other substantive claim, the law of Colorado governs. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Benson v. United States,* 141 Ct.Cl. 273, 299, 1958 WL 7323 (1958).

reasonable person standard "the greater the risk, the greater the amount of care required to avoid injury to others." *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 587 (Colo.1984). Thus, what constitutes reasonable care varies according to the degree of risk associated with the particular activity. *Imperial Distribution Servs., Inc. v. Forrest*, 741 P.2d 1251, 1254 (Colo.1987).

This enhanced standard of care theory holds that the reasonable or ordinary care in cases such as delivering electricity, which all must acknowledge to pose a high risk of injury to others, is "the highest care which human ingenuity can practically exercise, and that, as a matter of law, courts will hold every reasonably prudent and careful [person] to the exercise of the utmost care and diligence in protecting the public from the dangers necessarily incident to the carrying on of a hazardous business." *Simpson*, 41 P. at 501.

Vaporized propane is another example of an instrumentality the Colorado courts have found as requiring an enhanced degree of care by those supplying it to others. In *Blueflame Gas*, the court held that suppliers of propane "must exercise the highest degree of care, consistent with the practical conduct of their business under the present state of the art, in making certain that the propane is sufficiently odorized so that those persons who use this substance as a source of energy for heaters, stoves and other appliances will be alerted to the presence of escaping gas." 679 P.2d at 588. The court found that the trial court erred in defining the defendant's duty as reasonable care only. There are other instances where due to the gravity of the risk created by them, an enhanced measure of care on the part of the defendant is required. *See, e.g., Ambriz v. Petrolane, Ltd.*, 49 Cal.2d 470, 319 P.2d 1 (1957) (requiring a high degree of care for those handling butane gas); *Crane v. Adams*, 226 Miss. 436, 84 So.2d 530 (1956) (gasoline is a "dangerous agency" requiring highest degree of care); *Sterling v. Velsicol Chemical Corp.*, 647 F.Supp. 303 (W.D.Tenn.1986) (requiring a high degree of care for those maintaining a chemical waste burial site); *Clark v. United States*, 660 F.Supp. 1164 (W.D.Wash.1987) (high degree of care required for those operating a dump site and burn pits); *Benson*, 141 Ct.Cl. at 300 ("The danger inherent in a cargo of explosives would be part of the circumstances for consideration in determining what was ordinary.").

Plaintiffs briefly address the existence of a duty in their opposition brief. Plaintiffs argue that the Army's conduct on the RMA, manufacturing and demilitarizing chemical weapons and disposing of chemical wastes, created a substantial risk. This court agrees. While plaintiff's have offered little testimony on the duty of care, the point is made that the Army has, from the 1940's been engaged in extremely risky activities that demand the utmost care and diligence to protect the public.

This court is satisfied, after resolving all doubts as to the facts, presumptions, and inferences in favor of plaintiffs, that genuine issues of material facts exist as to plaintiffs' claims including those sounding in negligence. *See Auxier v. Auxier*, 843 P.2d 93, 95 (Colo.Ct.App.1992); *Webb v. United States*, 192 Ct.Cl. 925, 935 (1970); *Benson*, 141 Ct.Cl. at 300–01; *U.S. Fidelity & Guaranty v. Salida Gas Serv. Co.*, 793 P.2d 602, 603 (Colo.Ct.App.1989); *Sterling*, 647 F.Supp. at 316–17; *Clark*, 660 F.Supp. at 1176–77. Defendant has failed to convince the court that no issues of material fact exist as to defendant's negligence or wrong doing. Plaintiffs should understand, however, that this court considers defendant's arguments in its motion for summary judgment generally to be well-grounded. In particular, this court is concerned that plaintiffs have failed to produce an expert to testify on the issue of defendant's duty of care and defendant's breach of that duty. Expert testimony is normally required to establish a standard of care only when it involves questions beyond the competency of ordinary per-

sons.[15] However, defendant, thus far, has failed to convince the court that such testimony is required in this case. In short, plaintiffs' case has survived defendant's motion, for the most part, but by a very narrow margin. Therefore, assuming this matter progresses to trial, at the conclusion of their case in chief, plaintiffs should be prepared to respond to a motion for a directed verdict filed by the defendant.

## CONCLUSION

For the reasons stated above, the court denies defendant's motion for summary judgment.

---

**15.** *Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187, 210 (Colo.1984).